617 So.2d 1292 (1993)
STATE of Louisiana
v.
John CORLEY.
No. CR92-1193.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1993.
Rehearing Denied June 9, 1993.
*1294 Don M. Burkett, Many, for plaintiff-appellee State of La.
Richard V. Burnes, Alexandria, for defendant-appellant John D. Corley.
*1295 Before DOMENGEAUX, C.J., and GUIDRY and WOODARD, JJ.
GUIDRY, Judge.
The defendant, John D. Corley, was indicted on September 12, 1989, for the second degree murder of his wife, Glenda Wilson Corley, a violation of La.R.S. 14:30.1. The defendant's first trial ended in a mistrial during jury selection on January 17, 1990, because a key defense witness was unavailable. The second trial resulted in a second degree murder conviction on April 7, 1990. On appeal to this court, the defendant's conviction was reversed and a new trial was ordered because the jury instructions contained an unconstitutional presumption. State v. Corley, 587 So.2d 193 (La.App. 3rd Cir.1991), writ denied, 590 So.2d 1199 (La.1992). The defendant's third jury trial resulted in another second degree murder conviction on May 15, 1992.
On appeal, the defendant assigned eleven errors but has abandoned two of them. The remaining assignments of error concern the denial of a motion to quash the indictment and the denial of a motion to suppress evidence, a Brady violation, alleged erroneous denials of challenges for cause, admission of allegedly gruesome photographs, and denial of defendant's motions for new trial and post verdict judgment of acquittal.

ERROR PATENT
La.C.Cr.P. art. 930.8 provides that at the time of sentencing the trial court shall inform the defendant of the prescriptive period for post-conviction relief. The record shows the court did not do so. This defect has no bearing on whether the conviction is proper and thus is not grounds to reverse the sentence or remand the case for resentencing. La.C.Cr.P. art. 921. The three year prescriptive period does not begin to run until the judgment is final under La.C.Cr.P. arts. 914 and 922. The purpose of the Article 930.8(C) notice is to inform the defendant of the prescriptive period at time of sentencing. The district court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice. See State v. Cox, 604 So.2d 189 (La. App. 2d Cir.1992); State v. Stephens, 604 So.2d 203 (La.App. 2d Cir.1992).

FACTS
In the early morning hours of Friday, July 21, 1989, the Sabine Parish Sheriff's Office dispatched Deputy Tommy Sandel to the rural home of Mrs. Otto Corley, defendant's grandmother. Deputy Sandel arrived at the Corley residence at 2:08 a.m. and found the bruised body of Glenda Wilson Corley on the living room sofa. The defendant and his wife had been married approximately one week, but, prior to their marriage, had lived together for approximately one year. Present in the house were the defendant, his father (Charles Corley), younger brother (Scott Corley) and grandmother. The deputy learned that the defendant had awakened his grandmother by pounding on her door, and, when she awoke, she witnessed him attempting cardiopulmonary resuscitation (CPR) on his wife. The defendant was wearing a pair of blue jean shorts that his wife had worn earlier. The wife's body was nude and covered with scratches and bruises. Mrs. Corley called her son, Charles Corley, who arrived to find the defendant at the opened front door still giving CPR in an attempt to revive his wife. When the father asked him what happened, the defendant did not respond. Scott Corley was also called to the scene.
When Deputy Sandel asked the defendant what happened, his father responded that the defendant would not give a statement until he spoke to an attorney. Deputy Sandel did not attempt to further question the defendant. The defendant then took off his wife's shorts and put on his clothes, which he had retrieved from his car. The defendant also indicated to his father in the deputy's presence that he had lost his wedding ring.
*1296 When the other deputies and detectives arrived, Deputy Sandel informed them of defendant's desire to speak with an attorney. While the defendant was seated in the back of a police car, his father again told the defendant, within the hearing of Deputy Sandel, not to give a statement until he spoke with an attorney. The defendant was taken from the Corley residence at 3:45 a.m. and arrived at the sheriff's office shortly after 4:00 a.m. At 4:15 a.m., he signed a form acknowledging he had been informed of his Miranda rights.
At the Corley residence, the police were informed by Charles Corley that the victim's murder did not occur at the grandmother's home. Deputy Sandel recognized the mud on the defendant's car as "black land" mud originating from one of two roads in the parish. Shortly thereafter, the authorities located the murder scene on Ash Pond Road. At that location, they observed that only one car made tire tracks entering and leaving the dead-end logging road. The deputies also discovered a pair of female panties in the middle of the road plus signs of a chase and struggle in several locations.
Detective James McComic described the murder scene. The tire tracks entered the road, turned around at some point, and then stopped 118 yards from the intersection with the main road. At that point, someone exited from the passenger's side but not the driver's side. The police found scuff prints and footprints in the road indicating that a scuffle or disturbance occurred outside the car. Then the footprints broke into two sets of footprints leading to another scuffle area. The footprints were spaced almost four feet apart, consistent with the long strides of persons running. The lead set of footprints were smaller than the pursuing set of footprints, and the smaller footprints were later identified as the victim's. The second scuffle, 27 yards from the car, occurred in the middle of the road. The footprints continued for another 30 yards where a third scuffle took place. The pair of panties were found at this spot. The final area of disturbance was located four feet away in the ditch on the road's east side, where the investigators detected broken brush limbs and disturbed ground. They also recovered the defendant's wedding band.
When the deputies located and secured the murder scene, the defendant was already at the sheriff's office. Detective McComic and Deputy Jack Staton were aware that the defendant wished to consult an attorney before giving any statement. However, Detective McComic admitted that on at least one and possibly two occasions, he asked the defendant if he felt like talking to see if the defendant had changed his mind. The defendant continued to insist that he first speak to an attorney, and Detective McComic ceased his inquiries. The defendant was then taken by Deputies Staton and Joe Byles to the third floor jail for formal booking. Deputy Byles was unable to testify at trial, having suffered a stroke which rendered him unable to speak. Deputy Staton testified that, as he and Deputy Byles were leaving the defendant in the jailer's custody, Deputy Byles asked the defendant if he had anything to say or wanted to give a statement. The defendant responded that he would talk to Deputy Staton but not to Detective McComic. The defendant gave Deputy Staton an oral statement claiming that he and his wife were attacked by two unknown assailants who beat him and raped and killed his wife. Deputy Staton then asked the defendant to put his statement in writing. The defendant complied with this request by writing a three page statement which was completed at 6:40 a.m. Deputy Staton then notified Detective McComic that the defendant had given a written statement. No further statements were made by the defendant.
Dr. George McCormick, a forensic pathologist, performed an autopsy on the victim and determined that she died as a result of both severe head injuries and strangulation. An examination of the neck wound revealed that the victim's blouse was used to cut off her air flow. The head injuries were more likely the result of blows from a closed hand, and the pathologist estimated she received over a dozen blows to her head, neck, upper chest and back. The scratches on her body were *1297 consistent with her being dragged through brush and bramble.
The defendant entered a plea of not guilty and not guilty by reason of insanity, claiming that he was too intoxicated at the time of the crime to form a specific intent to kill, or that his long history of alcohol abuse resulted in a mental disease or defect rendering him unable to distinguish right from wrong at the time of the crime. After the defendant posted bail, he sought treatment for his alcoholism at an inpatient treatment facility. Several psychiatric experts testified about his alcohol problems. The major problems included "blackouts", periods of time in which a person becomes intoxicated to the point that he cannot remember what he did but remains alert and able to function. The defendant claimed to have no recollection of the beating and strangulation of his wife because he had become so intoxicated that he suffered a "blackout". The defendant also had a history of DWI arrests and convictions. After a night of drinking in February of 1989, he pulled his car out of a nightclub parking lot head-on into an eighteen wheeler truck, causing life-threatening injuries to Glenda Corley.
The defendant's family and friends testified that he had spent the day and evening of July 20, 1989, drinking beer and whiskey. That evening, while the defendant and his wife were visiting his father, he consumed almost an entire fifth of whiskey. His wife drove as they left his father's residence.
One bit of evidence which did not become apparent until the week before defendant's trial was the testimony of Lynn Saffold Corley (no relation to the defendant), formerly the victim's close friend. In October of 1988, the victim informed Lynn Saffold Corley that she and the defendant's youngest brother, Aaron Corley, had a sexual encounter after a night of heavy drinking with friends. At the time, the defendant and Glenda were not married nor engaged to be married, but they were living together in the same apartment. The defendant never mentioned anything about this until after his father told him about it on the night after the first day of jury selection. At that moment, the defendant claims to have recalled the victim, on the night of her death, telling him about the sexual encounter with his brother. The defendant argued this fact was sufficient provocation to reduce his crime to manslaughter.
The jury found the defendant guilty of second degree murder and rejected the insanity and intoxication defenses, and either did not believe that the defendant was aware of his brother's one-night affair with his then live-in girlfriend, or did not find such fact sufficient provocation to reduce his crime to manslaughter.

MOTION TO QUASH
The first two assignments of error concern the court's denial of defendant's motion to quash the indictment. This was the defendant's third trial after the first mistrial during jury selection and the second trial conviction was reversed on appeal. Although the grounds for quashal existed and were ascertainable before either trial, the defendant did not file a motion to quash before the commencement of either his first or second trial. It is arguable that, in failing to do so prior to the previous trials, defendant waived his right to bring the motion to quash at his third trial. We pretermit any discussion of a possible waiver and will address the merits of these assignments of error.
Defendant first contends that the trial court erred in denying his motion to quash the indictment based upon an irregularity in the selection, impaneling and swearing of the grand jury which indicted him. The grand jury was selected on August 7, 1989 but not sworn and charged until September 12, 1989, because the Spring grand jury had not yet completed an investigation. The September 12, 1989 court minutes reflect that the grand jury, "having been previously empaneled [sic]... met to be sworn and receive their charge".
La.C.Cr.P. art. 431 requires that "the grand jurors shall take the following oath when impaneled ...". The defendant argues that the delay between the selection *1298 of the grand jury and the giving of the oath and charge was of such gravity as to justify quashing the indictment. In particular, the defendant complains that the grand jurors were given no guidance with respect to their duties or conduct from August 7, 1989 until September 12, 1989. The defendant places much emphasis upon the language of the September 12, 1989 court minutes, which state that the grand jury had "been previously empaneled [sic]". He argues that, if the grand jury was "impaneled" long before it took its oath, then the grand jury was improperly constituted.
The procedure for selecting the grand jury requires that the jury commission randomly select a large general venire from which the grand jury venire is then selected. La.C.Cr.P. arts. 408 and 411. The twelve member grand jury is selected from the grand jury venire. La.C.Cr.P. art. 413. This article is entitled, in pertinent part, "[M]ethod of impaneling of grand jury;..." but the phrase "selected or drawn", not impaneled, is used in section (A) of that article. The comments following La. C.Cr.P. art. 414 indicate that, under the 1928 Code of Criminal Procedure, selection of the grand jury members and impaneling of the grand jury were separate acts. Indeed, a person may be selected to serve on the grand jury when the sheriff draws his name from the envelope, but not impaneled on the grand jury because of an exemption, undue hardship, or other legal cause to excuse service.
The key issue is whether or not the language of La.C.Cr.P. art. 431, "[t]he grand jurors shall take the following oath when impaneled: ..." mandates that, immediately upon selection of the twelve members of the grand jury, the grand jurors must be sworn and charged. La.C.Cr.P. arts. 431 and 432. As noted at the motion to quash hearing, after the Fall grand jury venire was subpoenaed to report to court on August 7, 1989, the presiding judge and district attorney realized that the Spring grand jury would not complete its ongoing investigation before August 7th. Realizing that the Spring and Fall grand juries could not be impaneled at the same time, and not wishing to dismiss the Spring grand jury which was near completion of its lengthy investigation, it was decided that the Fall grand jury venire would report on August 7th. The twelve members would be selected on August 7th but not officially impaneled until the Spring grand jury completed its investigation. When the grand jury veniremen selected to serve met again on September 12, 1989, they were sworn to their oath, charged and, on that same day, returned a true bill of indictment against the defendant.
In order to reverse a defendant's conviction, any defect, error or irregularity must prejudice a substantial right of the defendant. La.C.Cr.P. art. 921. Nothing in the code of criminal procedure requires that the grand jury immediately be sworn and charged after selection. Furthermore, a lapse of time between selection of the grand jurors and their swearing and charging by the court is not specifically prohibited. The defendant makes only conclusory allegations of prejudice as a result of this minor irregularity, but points to no fraud, misconduct or bad faith on the part of the presiding judge or district attorney. Accordingly, the trial court's denial of defendant's motion to quash the indictment on this basis was correct.
Defendant's second assignment of error also concerns the denial of the defendant's motion to quash the indictment. Defendant argues that he was prejudiced by the selection of the district attorney's secretary to the grand jury which indicted him.
On August 7, 1989, the random drawing from the grand jury venire resulted in Kellie Arthur being selected. Ms. Arthur was employed as a secretary by the district attorney. The district attorney explained that a question came up about her serving, and after research into the law, neither the presiding judge nor district attorney could find any legal ground to remove her. The district attorney stated that, despite the fact that Ms. Arthur was not his personal secretary, he did not want her to serve on the grand jury. However, no provision in *1299 the law existed to remove an otherwise qualified grand juror. The defendant argues that La.C.Cr.P. art. 401(B)(2), which permits a challenge for cause when reasonable doubt exists as to the competency of the prospective juror to serve as provided for in La.C.Cr.P. art. 787, should be construed to allow the trial judge to disqualify the employee of the district attorney's office.
The problem with applying the provisions for challenges and exclusion for members of trial juries to grand juries is that these juries perform inherently different functions. The duty of the trial jury is to hear admissible evidence and arguments, and then determine the defendant's guilt or innocence. La.C.Cr.P. art. 802. The trial juror can be challenged by the state or the defendant for cause or on any peremptory ground. La.C.Cr.P. art. 795 et seq. On the other hand, the duty of a grand jury is to inquire into and investigate all capital offenses or, such other offenses as requested by the district attorney or ordered by the court. La.C.Cr.P. arts. 431, 437. The grand jury does not determine a defendant's guilt or innocence, but returns an indictment charging a defendant with the commission of an offense when nine out of twelve grand jurors decide that the evidence considered by it, if unexplained and uncontradicted, warrants a conviction. That is, on the basis of the evidence adduced from witnesses or on the knowledge of the grand jurors, an indictment may be found upon establishing a prima facie case of guilt. La.C.Cr.P. art. 443.
The Code of Criminal Procedure contains no prohibition against a grand juror having knowledge of an offense. In fact, La. C.Cr.P. art. 438 requires a grand juror with knowledge of a possible offense to bring it to the attention of the entire grand jury and serve as a witness in subsequent criminal proceedings.
The defendant complains that it was a denial of due process of law under both the state and federal constitutions to allow an employee of the district attorney to serve on the grand jury. Louisiana Constitution Article 5, Section 33 provides the qualifications for jurors and the exemptions for jurors. The three constitutional qualifications for jurors are that they be 18 years of age, a citizen of Louisiana, and domiciled in the parish of jury service. The general statutory qualifications for grand jurors set forth in La.C.Cr.P. art. 401 parallel the constitution and add that a grand juror must also be able to read, write and speak English, not be under interdiction or incapacitated from serving due to mental or physical infirmity, and not be under indictment for a felony or an unpardoned convicted felon. The only two grounds for challenging for cause set forth in La. C.Cr.P. art. 401 are:
B. Notwithstanding any provision in Subsection A, a person may be challenged for cause on one or more of the following:
(1) A loss of hearing or the existence of any other incapacity which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the challenging party.
(2) When reasonable doubt exists as to the competency of the prospective juror to serve as provided for in Code of Criminal Procedure Art. 787.
La.C.Cr.P. art. 787 gives the trial judge wide latitude to disqualify prospective petit jurors. Unlike an adversarial trial by jury where counsel for the defendant and the State are present, the only counsel present for grand jury selection is counsel for the state. The exemptions from petit and grand jury service are as provided by the rules of the Louisiana Supreme Court pursuant to La. Const. Art. 5, § 33, and La. C.Cr.P. art. 403.
La.C.Cr.P. art. 403.1 provides the only ground for disqualification from grand jury serviceundue hardship. The First Circuit, in a civil case, noted that the qualifications for jury service in civil cases are the same as for service on a grand or petit jury. Usner v. Strobach, 591 So.2d 713 (La.App. 1st Cir.1991), writ denied, 592 So.2d 1289 (La.1992). In Usner, the provisions of La.C.Cr.P. arts. 401 and 787 were *1300 found by the court to not disqualify police officers and clerks of court from serving on a civil jury. This rule necessarily extends to grand jury duty also. The court in Usner further noted that Louisiana Supreme Court Rule XXV provides exemptions from jury duty. Implicit in the grant of exemptions to certain groups or occupational classes is the premise that these persons are considered qualified. Usner, supra at 722. Louisiana Supreme Court Rule XXV, § 3 further provides that a person may waive his exemption, or choose jury service, but the choice to waive or exercise his exemption is personal and "is not a ground for challenge". Therefore, a representative member of any of the five groups listed in Rule XXV, § 2 may serve on a grand jury, petit jury or civil jury. In our view, La.C.Cr.P. art. 797(3) was enacted to handle the situation in which a policeman or public officer chooses to waive his exemption and serve on a petit jury. That statute provides as follows:
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict; ...
Yet, a similar provision in reference to grand juries covering employees of the district attorney was not made part of Rule XXV, nor La.C.Cr.P. art. 401. This omission from the list of exemptions or qualifications for grand jury service reflects the reasoning of the legislature and the Louisiana Supreme Court that the different functions of a trial jury and that of a grand jury do not necessitate identical grounds for challenges of prospective jurors.
The failure of the presiding judge to disqualify Ms. Arthur because he found no specific legal cause or ground to do so does not mandate quashal of defendant's indictment. In State v. Cannon, 372 So.2d 1237 (La.1979), the Supreme Court reversed a defendant's several convictions and ordered that all indictments be quashed because a grand juror had been excused from serving due to undue hardship and substituted by another grand juror. The court ruled that once a person became a grand juror, he was irrevocably a member and could not be discharged or excused except for one of the legal causes under La.C.Cr.P. art. 401, which did not list undue hardship as one of its grounds. In 1980, the Cannon decision was legislatively overruled by the enactment of La.C.Cr.P. art. 403.1, which provides for disqualification for undue hardship. A criminal defendant has a right to be indicted by a grand jury chosen from a fair cross-section of the community. State v. Lawrence, 351 So.2d 493 (La.1977). However, he does not have a right to be indicted by any particular grand jury.
Not only did the defendant suffer no prejudice from Ms. Arthur serving on the grand jury, the defendant also failed to establish a specific statutory provision to disqualify the district attorney's secretary from service on the grand jury. For these reasons, the trial court did not err in denying defendant's motion to quash the indictment on these grounds.

MOTION TO SUPPRESS
The next two assignments of error urged by defendant concern the denial of the defendant's two motions to suppress statements made by the defendant. The statements sought to be suppressed were acknowledged by the defendant to be false. Prior to the defendant's first trial, the defendant filed a motion to suppress a written and an oral statement made by him after his arrest and after his invocation of his right to counsel, in violation of the rule set forth in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This issue serves as the basis for assignment of error number three. Assignment of error number four concerns the second motion to suppress that the defendant filed after his conviction was reversed, but before his third trial began. In this second motion to suppress, the defendant added a new claim that his oral and written statements were not voluntary and were the product of coercion and threats against his family. The second motion to suppress is *1301 the basis for assignment of error number four.
We first address assignment of error number four. The allegation that the defendant was threatened with prosecution for first degree murder and could be electrocuted was never mentioned at the first hearing. The claim of coercion and threats of prosecution of his family was mentioned by the defendant at the hearing on the first motion to suppress. Before the second hearing began, the State objected to the defendant being allowed to introduce more evidence in support of suppression of his statements. The defendant explained at the second hearing that he told his retained attorneys, Mike Small and Timothy Meche, about the threats. Small advised him to not present this claim to the court at the first hearing because it was too difficult to prove and the court would not believe him.
Once the defendant has made a specific allegation of misconduct, the State has the burden of proving that the defendant's statements were free and voluntary, and not the product of threats, fear, intimidation or promises. State v. Murray, 546 So.2d 944 (La.App. 3rd Cir.1989). The trial judge denied the suppression, finding no "credible evidence" of any threats or other actions by the police which would render the defendant's statements involuntary. The defendant and his father testified that the threats of a death sentence and prosecution of family members were related by Detective McComic. McComic denied making these threats to either defendant or his father. Additionally, the deputies who were with the defendant while he was in custody testified that they neither threatened or heard anyone threaten him with electrocution, or defendant's father and grandmother with prosecution as accessories if the defendant did not give a statement. The defendant's father and grandmother eventually reported to the sheriff's office to give statements concerning what they witnessed. Under these circumstances, the trial judge's denial of defendant's motion to suppress, based on reasonable evaluations of credibility, was not erroneous.
We next consider defendant's third assignment of error. The facts presented at the first suppression hearing and again at trial established that, after defendant was advised of his Miranda rights at his grandmother's home, the defendant's father told Deputy Sandel that his son would not give a statement until a lawyer had spoken to the defendant.
At the Sheriff's Office, defendant was again advised of his Miranda rights and he signed a form acknowledging he understood these rights at 4:15 a.m. Detective McComic, who knew of defendant's desire to speak with an attorney, then asked him twice to make a statement. Defendant responded negatively and reiterated his right to counsel. In response to an inquiry by Deputy Byles, defendant initially said "no" again then told Deputy Staton he would give a statement to him but not to Detective McComic. The defendant gave Deputy Staton an oral statement followed by a substantially similar written statement.
Defendant candidly admitted that both his oral and written statements were false. At the time, he felt he needed to say something to protect his father and grandmother, so he fabricated the story of the attack by two unknown assailants. The trial court denied defendant's motion, apparently finding that the defendant initiated the conversation with Deputy Staton and voluntarily gave the oral and written statements.
The defendant's first motion to suppress relied heavily upon the rule of Edwards v. Arizona, supra, which clarified and extended the exclusionary rule of Miranda v. Arizona, infra. In State v. Ross, 572 So.2d 238, 240 (La.App. 1st Cir.1990), the First Circuit, in applying the Edwards rule, reasoned as follows:
The statements of an accused, whether exculpatory or inculpatory, when made during a custodial interrogation, should be suppressed unless the accused is first advised of, and subsequently waives, his right to remain silent and his right to counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), U.S. Const.Amend. V, VI, La.Const. art.

*1302 I, § 13. When an accused asserts his right to counsel, the police must scrupulously honor the invocation of the right and interrogation must cease. State v. Harper, 430 So.2d 627, 633 (La.1983); State v. Campbell, 461 So.2d 644, 648 (La.App. 1st Cir.1984), writ denied, 466 So.2d 1299 (La.1985).
An accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); State v. Arceneaux, 425 So.2d 740, 744 (La.1983); State v. Campbell, 461 So.2d at 648. Furthermore, even when the accused initiates further communication, exchanges, or conversations with the police, and reinterrogation follows, the prosecution still has the burden of showing that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation. Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983); State v. Carr, 530 So.2d 579, 587 (La.App. 1st Cir.), writ denied, 533 So.2d 354 (La. 1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
Clearly, Detective McComic and Deputy Byles violated the prophylactic rule of Edwards v. Arizona. Accordingly, the trial judge erred in not suppressing the resulting exculpatory but acknowledgedly false statements. State v. Abadie, 612 So.2d 1 (La.1993). However, the trial judge's error was harmless. In State v. Lee, 524 So.2d 1176 (La.1988), on rehearing, 524 So.2d at 1191, the Louisiana Supreme Court explained:
... The test for harmless constitutional error is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963); State v. Gibson, 391 So.2d 421 (La.1980). Before a constitutional error can be considered harmless, the reviewing court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman, 386 U.S. at 24, 87 S.Ct. at 828. If there is a reasonable possibility that the evidence complained of contributed to the verdict, then it can hardly be concluded beyond a reasonable doubt that the error was harmless.
The defendant's false statements were that unknown assailants drove up to his parked car, attacked him and murdered his wife, and then left the scene. Before the defendant gave his statements at the sheriff's office, the deputies who had remained at his grandmother's house located the scene of the murder, which on further investigation revealed that only one vehicle, the defendant's, had been on the road. They also determined that the victim was chased, beaten and then dragged through the undergrowth back to the defendant's car. As Detective McComic was reviewing the defendant's written statement or shortly before, he was notified that the crime scene had been located. Therefore, the prime substantive evidence against defendant did not derive from his statements. The prosecution primarily used defendant's statement as impeachment evidence and to show the defendant's state of mind after the crime. The other direct and circumstantial evidence against the defendant was sufficient to prove his guilt. We conclude that the admission of defendant's statement was harmless error.

STATE'S DELAY IN DISCLOSING EXCULPATORY EVIDENCE
By the defendant's fifth assignment of error, he complains that the trial court erred in refusing to grant defendant's motion for new trial based upon the state's delay in disclosing exculpatory evidence. The defendant filed a pretrial motion to discover which included a general request for exculpatory or favorable evidence. The State responded it had neither possession nor knowledge of any exculpatory evidence. *1303 At the end of Monday, May 11, 1992, the first day of jury selection, the district attorney informed counsel for defendant and defendant's father that Lynn Saffold Corley (no relation to defendant), a friend of the victim, had been told by Glenda Corley in October of 1988, that she and Aaron Corley, defendant's youngest brother, had a one-time sexual encounter after a night of drinking at the defendant's apartment. This encounter occurred before the defendant and Glenda Wilson were engaged, but after they were living together in a Many apartment. When defendant's father told the defendant on May 11, 1992, what the district attorney had said, the defendant claimed he was "stunned" at first. He then alleged that the news jogged his memory of what occurred on the night of his wife's death. Defendant claimed to remember Glenda telling him on that night of her sexual experience with Aaron Corley "in a cruel, mean way".
Lynn Saffold Corley was originally subpoenaed by the State only because she had been with the victim on the day prior to her murder. When the defense learned that she had information of the sexual encounter with Aaron Corley, the defendant subpoenaed Lynn Saffold Corley, and she testified on the defendant's behalf. She told the jury that Glenda was afraid to tell the defendant about the one-night stand with his brother for fear the defendant would kill her. The defendant argues that he was prejudiced by his inability to present this evidence to his psychiatric expert witnesses and have them incorporate it in their diagnoses of him.
The defendant cites Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as support for his claim. A tardy disclosure of evidence during trial is not a true Brady case. As noted in State v. Smith, 430 So.2d 31, 42 (La.1983):
The case at bar, however, is distinguishable from Brady, for we do not have a situation where withheld information was discovered only after conviction, but one where the exculpatory evidence became available to the defense during trial. See United States v. Kaplan, 554 F.2d 577 (3rd Cir.1977). Not all cases involving late disclosure of exculpatory evidence result in reversible error. We must determine whether the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. State v. Arnaud, 412 So.2d 1013 (La.1982); State v. Roussel, 381 So.2d 796 (La.1980); State v. Manning, 380 So.2d 46 (La.1980).
In the present case, the district attorney told the court that he learned about the substance of Lynn Saffold Corley's testimony during the week before the defendant's trial. Prior to this, the district attorney only knew that Lynn Saffold Corley was with the victim on the day of her death. The district attorney did not say why he waited until the following Monday to disclose this information, but did note that he initially considered it to be one of the many unsubstantiated rumors surrounding the case that were eventually proven untrue. The issue here is whether the late disclosure so prejudiced the defendant that he was denied a fair trial.
When informed of the testimony of Lynn Saffold Corley, the defendant had an option to request a recess to conduct an investigation or even request a mistrial. The defendant did make an oral motion for continuance to obtain the presence of Lynn Saffold Corley, and she appeared the next day to testify. The defendant never raised at trial the psychiatrists' need to re-examine defendant in light of this new evidence. We do not see how their testimony, which mainly concerned the effect of alcohol on defendant's ability to form specific intent, would have been substantially changed with knowledge of the victim's single encounter with Aaron Corley.
At the hearing on the motion for new trial, the defendant argued that such evidence could have been viewed as sufficient provocation to reduce the degree of the offense from second degree murder to manslaughter. This is a question of fact for the jury, which had the benefit of witnessing Lynn Saffold Corley and defendant testify on this issue. Assuming Lynn Saffold *1304 Corley testified truthfully, the real issue is whether or not the defendant was actually aware of the sexual encounter before May 11, 1992. Except for defendant's spontaneous revelation, the jury was presented with the fact that the defendant never mentioned this, even after counseling, hypnosis and examination by numerous mental health professionals, until he was told about it on Monday, May 11, 1992. Additionally, his prior trials did not jar this fact from his memory. It is doubtful that his wife actually told defendant of her one-night affair on the night of her death. The jury either did not believe that the defendant knew about the encounter before May 11, 1992 or felt it was insufficient provocation to warrant a reduction to manslaughter.
We conclude that the jury reasonably weighed the credibility of the testifying witnesses on this issue and reached a factual conclusion that was not erroneous. The late disclosure of the information did not prejudice the defendant to the extent that his constitutional right to a fair trial was denied. Accordingly, the trial court did not err in denying defendant's motion for new trial based upon late disclosure.

CHALLENGES FOR CAUSE
This assignment of error concerns the denial of three of the defendant's challenges for cause against prospective jurors. It is not clear from the record whether the defendant exhausted all of his peremptory challenges during jury selection. Jackie Holton was challenged for cause by the defendant, and after this causal challenge was rejected by the trial court, the defendant allegedly exercised a peremptory challenge. Yet, the court minutes and transcript show that the State exercised a peremptory challenge to excuse Jackie Holton. We conclude the defendant suffered no prejudice as a result of the trial court's rulings.
In order to obtain a reversal based upon the trial court's denial of a challenge for cause, a defendant must show: (1) that the trial judge erred in refusing to sustain the challenge for cause; and, (2) that defendant exhausted all of his peremptory challenges. State v. Neil, 540 So.2d 554 (La.App. 3rd Cir.1989), and cases cited therein. The trial court is vested with broad discretion in ruling on a challenge for cause, and that ruling will not be disturbed on appeal absent a showing of an abuse of that discretion. A review of the entire voir dire, and not selected portions, is essential to determine if the trial court erred. State v. Gintz, 438 So.2d 1230 (La. App. 3rd Cir.1983). A challenge for cause is not warranted when a prospective juror makes a statement which may be prejudicial to the defendant but is later rehabilitated by further inquiry or instructions by the court, and the prospective juror demonstrates the ability and willingness to decide the case impartially according to the law and evidence presented in court. State v. Bates, 397 So.2d 1331 (La.1981).
The three prospective jurors challenged were Betty J. Drew, Rebecca J. Salter, and Jackie Holton. A review of the record establishes that Betty J. Drew was rehabilitated after further questioning by the trial judge who actually had problems understanding her original responses. Rebecca J. Salter gave conflicting answers. She was aware of the crime since she had once worked with the victim, but said she could be fair and render a verdict based upon the evidence presented in court. The trial court further questioned Ms. Salter and rehabilitated her by clarifying her answers. Jackie Holton was challenged for cause because she had no child care arrangements for her one-year-old son if the trial extended into the weekend. However, counsel for defendant informed the court that the trial would be completed within the week. Thereafter, the State used a peremptory challenge to excuse Ms. Holton. The same result occurred as if the trial court had granted the defendant's challenge for cause. Therefore, defendant was not prejudiced. This assignment of error is meritless.

ADMISSIBILITY OF PHOTOGRAPHS
The defendant complains that the trial court erred in admitting photographs *1305 of the victim which he argues were gruesome, duplicative, and prejudicial. Counsel for the defendant conceded during opening statement that the defendant had beaten and strangled his wife. In admitting the photographs into evidence, the court relied upon the jurisprudential rule that a defendant cannot stipulate to an element of the crime in order to take the "punch" out of the State's case. The State introduced the photographs to prove corpus delicti and the defendant's specific intent to kill or inflict great bodily harm upon his wife, an element of proof of second degree murder. Defendant denied he was capable of forming the requisite specific intent. This is a necessary element of proof of second degree murder. Thus, the photographs were used by the State to prove this essential element of the crime.
Neither party may require the other to stipulate to any facts and any party may insist upon proving the facts of his case. A defendant may not be permitted to rob the State's evidence of its fair and legitimate weight by means of a unilateral stipulation. State v. Gilmore, 332 So.2d 789 (La.1976). A defendant cannot control the State's method of proof, nor can a defendant exclude from the jury's consideration relevant evidence concerning a crime merely by offering to stipulate. State v. Mattheson, 407 So.2d 1150 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983), rehearing denied, 463 U.S. 1249, 104 S.Ct. 37, 77 L.Ed.2d 1456 (1983). In State v. Perry, 502 So.2d 543, 559 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987), rehearing denied, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1988), the court reasoned:
The defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs. State v. Watson, 449 So.2d 1321 (La.1984); State v. Lindsey, 404 So.2d 466 (La.1981). The court's admission of allegedly gruesome photographs will be overturned on appeal only if the prejudicial effect of the photographs clearly outweighs their probative value. State v. Watson, supra; State v. Boyer, 406 So.2d 143 (La.1981).
The trial court's ruling that the photographs were not gruesome is not erroneous. The pictures are not pleasant to view, but they certainly are not horrifyingly graphic. In addition, the defendant's admission that he killed his wife should not prevent the State from introducing the photographs to prove that he acted with the specific intent to kill when he beat and strangled her.
The trial court did not err by admitting the photographs into evidence.

MOTION FOR NEW TRIAL
The defendant argues that the trial court erred in refusing to grant his motion for new trial. Of the ten grounds for new trial asserted by the defendant, seven have been disposed of in this opinion. Ground four is identical to assignment of error number six which the defendant abandoned on appeal and which the defendant did not argue in this assignment of error. It is not considered herein. We address ground nine in the final assignment of error concerning defendant's motion for post-verdict judgment of acquittal because it involved sufficiency of the evidence and urged the Jackson v. Virginia, infra, standard of review instead of the "thirteenth juror" standard for a sufficiency of the evidence claim required in a motion for a new trial. See State v. Landry, 524 So.2d 1261 (La.App. 3rd Cir.1988), writ granted in part (on other grounds), 531 So.2d 254 (La.1988), appeal after remand, 546 So.2d 1231 (La.App. 3rd Cir.1989).
On ground 10, defendant argues that the "ends of justice" require that he be granted a new trial because the cumulative effect of the errors mandate reversal of his conviction and remand for a new trial. See La.C.Cr.P. art. 851(5). In State v. Bender, 598 So.2d 629, 638 (La.App. 3rd Cir.1992), writ denied, 605 So.2d 1125 (La.1992), this court reasoned as follows:
We have addressed the issues raised in defendant's motion for new trial in the various assignments of error discussed hereinabove. The only other contention not treated yet is defendant's assertion *1306 under LSA-C.Cr.P. Art. 851(5) that the ends of justice would be served by the granting of a new trial.
When defendant's motion for a new trial is based on the ground of satisfying the demands of justice, denial of the motion presents nothing for appellate review. State v. King, 563 So.2d 449 (La. App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990). Accordingly, we find that this additional ground presents nothing for us to consider on this appeal.
We conclude that the trial court did not err in denying defendant's motion for new trial.

MOTION FOR POST-VERDICT JUDGMENT OF ACQUITTAL
In his final assignment of error, defendant contends that the trial judge erred in denying his motion for post-verdict judgment of acquittal based on insufficiency of the evidence. In denying the motion, the trial judge applied the standard expressed in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The defendant raised several defenses: insanity, intoxication, and provocation sufficient to reduce the crime to manslaughter. The intoxication defense is intertwined with the insanity defense. In State v. Hilburn, 512 So.2d 497, 503 (La.App. 1st Cir.1987), writ denied, 515 So.2d 444 (La. 1987), the court, in dealing with a similar case of a husband who murdered his wife and then claimed legal insanity as a result of alcohol abuse, explained as follows:
In Louisiana a defendant is presumed sane, and the state is not required to prove sanity. La.R.S. 15:432. A defendant who wishes to negate the presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. La. C.Cr.P. art. 652; State v. Roy, 395 So.2d 664 (La.1981). Legal insanity in Louisiana means that a defendant has a mental disease or defect which prevents him from distinguishing right from wrong with reference to the conduct which forms the basis for the criminal charge against him. La.R.S. 14:14.
The standard of review applicable when a defendant pleads the affirmative defense of insanity and claims that there is insufficient evidence to support a finding of guilt beyond a reasonable doubt is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Roy, 395 So.2d at 667.
[I]t is left to the factual determination of the jury to determine whether the defendant was capable of knowing right from wrong with regard to the conduct complained of. All of the evidence, including both expert and lay testimony and conduct and action of the defendant, should be considered by the jury in determining sanity.

State v. Heath, 447 So.2d 570, 575 (La. App. 1st Cir.), writ denied, 448 So.2d 1302 (La.1984).
At trial, defendant presented the testimony of two psychiatrists, Drs. Paul Ware and Joe Ben Hayes, who had examined and treated him for his alcoholism after he killed his wife. They both testified that the defendant was so intoxicated on the night of the crime that he suffered an alcohol-induced blackout which prevented him from forming specific criminal intent. The psychiatrists further testified that the defendant was so intoxicated on the night of the crime that he could not distinguish right from wrong. In rebuttal, the State presented the testimony of Dr. George Seiden, who had not examined the defendant. Dr. Seiden testified that blackouts will affect a person's memory but not always a person's ability to form intent. He explained that, as an alcoholic, the defendant could have had a blackout as a result of having a blood alcohol level of 0.3%, but still be able to carry out activities with intent. The defendant complains that the trial court erred in denying his motion because the testimony of the defendant's experts was unrebutted.
*1307 A trier of fact may accept or reject, in whole or in part, the testimony of any witness. State v. Jeansonne, 580 So.2d 1010 (La.App. 3rd Cir.1991), writ denied, 584 So.2d 1170 (La.1991); State v. Hilburn, supra. A mental defect, such as intoxication, which falls short of legal insanity is not sufficient to reduce the grade of the crime. State v. Harris, 527 So.2d 1140 (La.App. 1st Cir.1988). Further, the use of drugs or alcohol at the time of the commission of the crime does not constitute proof of a mental disease or defect. State v. Wry, 591 So.2d 774 (La.App. 2d Cir. 1991).
Thus, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense.
The defendant alternatively argues that, as a result of his intoxication, he lacked the ability to form a specific intent, which is an essential element of the crime of second degree murder. The court in State v. Hilburn, supra at 504, stated that:
Specific intent is defined as the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent is a legal conclusion to be resolved ultimately by the trier of fact. Since specific criminal intent is a state of mind, it need not be proven as a fact, but it may be inferred from the circumstances present and actions of defendant. State v. Graham, 420 So.2d 1126 (La.1982).
Voluntary intoxication is a defense to a prosecution for a crime only when the condition precludes the presence of a specific criminal intent or of a special knowledge required in that particular crime. La.R.S. 14:15(2). "When defenses which actually defeat an essential element of an offense, such as intoxication, are raised by the evidence, the state must overcome the defense by evidence which proves beyond a reasonable doubt that the mental element was present despite the alleged intoxication." State v. Guidry, 476 So.2d 500, 503 (La.App. 1st Cir. 1985), writ denied, 480 So.2d 739 (La. 1986) (citation omitted).
The fact that a defendant was drinking before he committed a murder is not, of itself, sufficient to negate specific intent. State v. Maxey, 527 So.2d 551 (La.App. 3rd Cir.1988), writ denied, 541 So.2d 868 (La. 1989); State v. Salas Martinez, 524 So.2d 871 (La.App. 3rd Cir.1988), writ denied, 525 So.2d 1047 (La.1988).
From the defendant's description of how much beer and hard liquor he consumed the day of the murder, Dr. Ware estimated the defendant's blood alcohol level at 0.27 percent at the time of the beating of the defendant's wife. Yet, in State v. Salas Martinez, supra, a measured blood alcohol level of 0.29 was not sufficient to deprive the defendant of the requisite criminal intent to commit second degree murder.
In the present case, the evidence established that the defendant chased his wife for 57 yards, stopping several times to struggle with her, he used his bare hands to beat her to death and strangle her. The defendant then dragged her lifeless body to his car and drove to his grandmother's home. The defendant attempted CPR to revive his wife, but from the description given by defendant's father and brother, Scott, it appears the defendant was trying to create the appearance that he wanted her to live. After the defendant's arrest, none of the police officers described the defendant as being so intoxicated that he needed medical treatment or was unable to converse with them. The defendant understood what he was doing and what was happening because he continued to refuse to give a statement until he spoke to an attorney his father was hiring. Finally, the defendant knowingly gave a fictitious statement blaming unknown assailants. The actions of the defendant contradict any claim that he was too intoxicated to have specific criminal intent when he chased, beat and strangled his wife, and then tried to place blame on others. The defendant's appearance and conduct after arrest further *1308 negate his claim. Therefore, the trial court did not err in rejecting the intoxication defense.
The defendant did not brief his claim of provocation as a result of his wife's premarital sexual encounter with his brother. However, this fact was apparently rejected by the jury as insufficient provocation to deprive an average person of his self control and cool reflection.
This assignment of error is meritless.
For the foregoing reasons, the defendant's conviction and the sentence imposed are affirmed. The trial court is instructed to give defendant the notice required by La.C.Cr.P. art. 930.8 in accordance with this opinion.
AFFIRMED WITH INSTRUCTIONS.