633 So.2d 151 (1994)
STATE of Louisiana
v.
John D. CORLEY.
No. 93-K-1934.
Supreme Court of Louisiana.
March 11, 1994.
Rehearing Denied May 12, 1994.
*152 Jimmy C. Teat, Jonesboro, for applicant.
Richard P. Ieyoub, Atty. Gen., Don M. Burkett, Dist. Atty., Charles B. Adams, Mansfield, for respondent.
PER CURIAM:[*]
We granted the defendant's application to review the correctness of the Third Circuit's decision affirming the defendant's conviction and sentence for the second degree murder of his wife after his third trial for that offense.
Defendant's first trial ended in a mistrial. His second closed with a verdict of guilty as charged. The Third Circuit reversed that conviction on grounds that the trial court charged the jury in violation of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). State v. Corley, 587 So.2d 193 (La.App. 3rd Cir.1991), writ denied, 590 So.2d 1199 (La.1992). On remand of the case, a third jury again found him guilty as charged. The Third Circuit affirmed that conviction despite finding that the trial court erred in admitting a statement secured from the defendant by the police within hours of the offense in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The court of appeal found the error harmless on grounds that "[t]he other direct and circumstantial evidence against the defendant was sufficient to prove his guilt." State v. Corley, 617 So.2d 1292 (La.App. 3rd Cir.1993). After conducting an independent review of the record, however, we are unable to say that the error in admitting the statement did not contribute to the jury's verdict. We reverse the judgment of the court of appeal accordingly.
In the early morning hours of July 21, 1989, the defendant brutally beat and strangled his wife to death on Black Land Road, a rural dirt road approximately two miles from his grandmother's home outside Florian, Louisiana. That much was acknowledged by the defense at the outset of trial, although defendant had initially tried to deflect suspicion from himself by giving an exculpatory, and concededly false, statement to the police shortly after his arrest. The defendant presented the testimony of two Shreveport psychiatrists, Drs. Joe Ben Hayes and Paul Ware, in support of his defense that he had killed his wife during an alcoholic blackout so profound that it deprived him of the capacity to form a specific intent to kill and so closely allied to an organic brain syndrome caused by years of alcoholic abuse that it rendered him incapable of distinguishing right from wrong at the time of the offense. According to this defense, the defendant's coherent memory of that evening ended when he left the home of his father and began again when he found himself looking down at the naked body of his battered wife on Black Land Road. The defendant was also naked and he pulled on his wife's cut-off shorts before placing her in his sports vehicle and driving to his grandmother's home, where he administered CPR in an attempt to revive her and called his father.
The defendant testified that he had only fragmentary memories of the struggle with his wife, including an admission by the victim after they parked on the Black Land Road that she had slept with his younger brother *153 before they were married and considered the brother a better lover. That memory came to him, the defendant told jurors, after a conversation with his father shortly before the beginning of his third trial in which he learned that his wife had made a similar confession to one of her friends less than a year before her death.
The state responded with expert testimony of its own from Dr. George Seiden, also a Shreveport psychiatrist, who informed jurors that the defendant's specific memory of his wife's confession to him on Black Land Road appeared inconsistent with the vague fragmentary memories which usually accompany an alcoholic blackout. While conceding that severe alcoholism linked to organic brain syndromes could interfere with an individual's ability to form intent, Dr. Seiden testified that "with the information I have read and listened to that, that was not the case here." The state also asked jurors to consider what the circumstances of the offense said about the defendant's capacity to form intent. Physical evidence on the scene indicated that the victim struggled with the defendant for approximately one hundred yards before succumbing to his blows.
In his statement to the police on the morning of his wife's death, the defendant related that after he and his wife visited his father in Plainview, Louisiana, they headed for home and turned onto Black Land Road "to go parking for a little while, like we used to do." They were "engaged in making out, not intercourse," when two men suddenly appeared and pulled the defendant and his wife out of their vehicle. While one of the men kept the defendant at bay, the other attacked his wife and killed her. The men fled in their own truck, and the defendant drove his wife's body to his grandmother's home.
The defendant gave this statement to Deputy Sheriff Jack Staton at 6:40 a.m. on the morning of July 21, 1989. He had been advised by his father at the home of his grandmother, where he was arrested by deputy Staton, not to give any statement about his wife's death before conferring with an attorney. Deputy Staton heard the advice and made no effort to interrogate the defendant during the ride to the Sabine Parish Sheriff's Office located in the Many courthouse. Before placing him in his patrol unit, the deputy advised defendant of his Miranda rights and gave him a second set of warnings in the basement office of Detective James McComic, who had taken over the investigation. While waiting for McComic to return to his office, Staton tried unsuccessfully to take a statement from the defendant, who informed the deputy that he would continue to follow his father's advice.
McComic arrived shortly thereafter and he was fully briefed by the deputies about the defendant's decision to consult with an attorney before giving a statement. The detective assumed that defendant's father was attempting to contact a lawyer. At the original hearing on the motion to suppress in 1989, McComic testified that he nevertheless asked the defendant "a couple of times" whether he felt like talking about his wife's death. The defendant had replied that he did not, and that he would "rather wait and talk to an attorney." "I just seen that the man didn't want to talk," McComic testified, "... I was through with that part of it."
Deputy Staton had remained present in his office, and McComic turned the defendant over to him for booking. Staton and Deputy Sheriff Joe Byles then accompanied the defendant from the basement of the building to the jail on the third floor of the courthouse. According to Staton, when they arrived on the third floor, and just before they released the defendant to the jailer for booking, deputy Byles asked the defendant if he wanted to make a statement. The defendant replied that he did not; then, as the officers began to leave, indicated that he would speak only to Staton. The defendant gave Staton an oral statement outlining his exculpatory version of the victim's death. He then wrote out the statement in longhand in Staton's presence. At trial, the state distributed copies of the statement to jurors to follow while Staton read it out loud.
The record fully supports the Third Circuit's determination that Staton took the defendant's statement in violation of Edwards v. Arizona and its bright-line rule that "an accused ... having expressed his desire to deal with the police only through counsel, *154 is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id., 451 U.S. at 482-84, 101 S.Ct. at 1884-85. The record shows that the defendant had made a direct and unambiguous request for counsel to deputy Staton and Detective McComic; that the officers fully understood his desire to speak to an attorney before giving them a statement; and that it was only after Byles reapproached the defendant, under the immediate pressure of booking on a charge of murder and under circumstances which made clear that the police effort to obtain a statement was a continuing one despite his repeated requests for counsel, that the defendant asked to speak with Staton about the offense. See State v. Abadie, 612 So.2d 1 (La.1993). The Third Circuit therefore found correctly that the police conduct in this case violated the per se Edwards rule.
This Court has both the authority and the obligation to review the record de novo to determine an error's harmfulness. State v. Smith, 600 So.2d 1319 (La.1992); see also Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In doing so, we must begin with the premise that the other, lawfully admitted evidence is sufficient to support the jury's verdict, Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). The task of a reviewing court conducting a harmless error analysis is to determine whether the error contributed to the verdict or whether "the force of the evidence presumably considered by the jury in accordance with the instructions [of the court] is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the [error]." Yates v. Evatt, 500 U.S. 391, 405, 111 S.Ct. 1884, 1893-94, 114 L.Ed.2d 432 (1991).
A review of the record shows that the state's principal investigating officers, McComic and Staton, testified extensively about the circumstances surrounding the defendant's statement. The state introduced the statement during its case-in-chief, used it in cross-examining the defendant, and referred to it during closing arguments. The state also used it to examine a fourth witness, handwriting expert Robert Foley, to show for jurors on the basis of defendant's handwriting that he was not impaired on the night of the offense. Jurors could look to the statement for what it revealed of the defendant's state of mind only hours after the offense and as contemporaneous evidence of how deep the defendant's alcoholic black-out had been. Part of that statement was concededly false, but the particular details of the defendant's last sexual encounter with his wife tended to explain other evidence in the case, including his bizarre appearance at his grandmother's house clad only in his wife's shorts. The defendant's statement thus suggested that his memory of the offense was less fragmentary and less dependent on subsequent mnemonic cues than he claimed.
On this record, we are unable to say that introduction of the statement was unimportant in relation to all of the other evidence in the case and that the jury's rejection of the intoxication and insanity defenses "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. ___, ___, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993). Accordingly, we reverse the defendant's conviction, vacate his sentence, and remand this case to the district court for all further proceedings not inconsistent with this opinion.
CONVICTION AND SENTENCE REVERSED; CASE REMANDED.
NOTES
[*] WATSON, J., not on the panel. See Rule IV, Part 2, § 3.