DOUCET, Judge.
Lola Mae Love was indicted for second degree murder and tried by a jury of twelve. By a ten to two vote, the jury convicted her of manslaughter and she was sentenced to serve twelve years at hard labor. On appeal, defendant asserts three assignments of error.
ASSIGNMENT OF ERROR NO. 1:
In this assignment of error, defendant contends there is insufficient evidence to support the jury’s verdict of guilty of manslaughter. The standard for reviewing sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Honeycutt, 438 So.2d 1303 (La.App. 3rd Cir.1983), writ denied, 443 So.2d 585 (La.1983).
While the manner in which the victim was shot is disputed, it is undisputed that a bullet from defendant’s gun killed the victim. Basically, defendant contends that the gun accidentally discharged when the victim grabbed the hand in which defendant was holding it. An eyewitness to the shooting, Ms. Loretta West, testified on behalf of the state and offered testimony contradicting defendant’s version of the facts.
According to the defendant, the events of the evening on which the victim was shot transpired as follows. On February 19, 1987, the victim visited defendant’s house but the defendant refused to answer the victim’s knock as she had a male inside the house and feared the victim’s reaction had he discovered this fact. A short time later, the victim passed slowly by the defendant’s house and then hurriedly left. Later that same evening the victim phoned defendant and expressed his dissatisfaction at defendant’s earlier refusal to answer his knock. During the conversation, the victim told defendant he had child support money to give to her and asked permission to come to her home. Since defendant feared the victim’s violent temper and defendant was aware that the victim was angry with her, defendant refused the victim’s request.
Twice more that evening the victim phoned the defendant and then the defendant phoned the victim. During the last telephone conversation, the victim told defendant that if she wanted the money she would have to come get it. After taking her children to her mother’s, the defendant went to the victim’s house to get the money, but was informed by the victim’s son that the victim had just left. When the *422 defendant was on her way back to her mother’s to pick up her children, she saw the victim at a gas station. Defendant pulled into the gas station and as the victim approached her car defendant placed her gun in her purse. The victim told defendant that he had his cousin in the car as they were going to Shreveport, but if the defendant followed him to his uncle’s house he would give her the money.
As the two cars pulled in front of the victim’s uncle’s house, defendant and the victim exited their cars about the same time and met between the two cars. The defendant, carrying her purse, walked side by side with the victim up the pathway towards the victim’s uncle’s house. When the two reached the halfway point of the walkway, the victim grabbed defendant’s arm and turned her around. As the defendant put up her left hand to prevent the victim from striking her, the victim grabbed her hand and began bending it backwards.
The victim questioned defendant on why she refused to answer his knock earlier and who had been in the house with her. While still bending her left hand backwards, the victim struck defendant in the chest and then started “poking” her. It was at this point defendant reached in her purse and pulled out her gun. As the victim grabbed the defendant’s hand with his left hand, the gun discharged. When asked if she told the victim to stop, defendant responded, “When he had my left hand, twist ... bending it backwards, I backed up trying to get away. I told him to stop, and that’s when he grabbed me again the second time but he was still holding on to my left hand.”
Shocked at what had just occurred, defendant just stood and watched the victim run onto the next lawn and fall. As the defendant was walking back towards her car to leave the scene without rendering any assistance to the victim, she saw the person in the victim’s car drive away. The defendant then reported the shooting to the authorities and voluntarily went down to the police station to give a statement.
To support her contention of physical abuse just prior to the shooting, defendant called Michael W. Wiley of the Rapides Sheriff’s Office to testify. Officer Wiley testified his job requires him to interview arrested persons to obtain information such as bonding information, whether the accused is able to afford an attorney, whether they need medical attention, etc. In interviewing defendant, Officer Wiley observed that she was withdrawn and quiet. Officer Wiley asked defendant if she was hurt and she replied that her left hand was hurting. Observing that her hand appeared to be “somewhat swollen”, the officer set defendant up to see a medic to determine if she required medical attention. Officer Wiley’s testimony regarding defendant’s swollen left hand is claimed by defendant as substantiation that the victim was physically attacking her prior to the shooting.
Defendant's sister, Paula Chapman, was called to testify regarding prior incidents of physical abuse inflicted upon defendant by the victim. The first occasion occurred in early December when the defendant, the defendant’s sister, and the defendant’s sister’s boyfriend were all watching television and the victim showed up wanting to talk to defendant. The victim and defendant went into a back bedroom to talk and then the defendant’s sister heard the defendant say, “Let me go.” As the defendant’s sister entered the bedroom she saw that the victim was twisting defendant’s arm and had pushed her up against a wall. The altercation was broken up by the defendant’s sister’s boyfriend. On a different occasion, the defendant’s sister observed the victim push the defendant against a wall and heard him say to defendant, “Bitch, I’m going to hurt you.”
The version of the events of the fatal evening as offered by Loretta West, an eyewitness testifying on behalf of the state, differs substantially from that offered by the defendant. Loretta West met the victim for the first time two days prior to the shooting. The two met when the victim came to Loretta’s house to turn on her electricity. As a result of their initial meeting, the victim asked Loretta if she *423 would like to go out and the two went to a movie that evening. On the day of the shooting, Thursday, February 19th, Loretta West again saw the victim when he stopped by her house to see if she would like to go to Natchitoches with him. Miss West agreed to accompany the victim to Natchi-toches and it was agreed they would leave about 7:30 p.m. on that evening. The purpose of the trip was to bring the victim’s uncle to Natchitoches.
The victim picked up Miss West about 7:30 and they stopped at a gas station so that the victim could put gas in his car. While at the gas station, the victim pumped gas, paid for the gas, and purchased a Dr. Pepper and a beer. Miss West then noticed a white car pull up behind the victim’s car and observed the victim approach the white car and speak to the driver. The victim then drove a short distance to what Miss West presumed was his uncle’s house. As the victim pulled up to his uncle’s house, Miss West noticed the white car from the gas station had pulled up behind them. According to Miss West the defendant approached the victim’s car and began knocking on the driver’s side window. At the request of the defendant, the victim exited his car and the two moved between the two cars to converse. Miss West observed through the rear view mirror the victim and defendant.
The victim then began walking up the pathway towards what Miss West assumed was the victim’s uncle’s house and the defendant followed the victim. At some point the defendant touched the victim on his right arm and the victim jerked away. The defendant then pulled a gun from out of her jacket and shot the victim. Contrary to defendant’s version, Miss West testified the victim never reached for the gun. After walking towards the victim, the defendant turned and began walking towards the victim’s car while pointing the gun at Miss West. At this point Miss West moved from the passenger seat of the victim’s car to the driver’s seat and left the scene. After driving around the block, Miss West returned to the scene to render assistance to the victim.
The testimony of a gunshot residue expert lends some support to defendant’s contention that the gun discharged when the victim grabbed her hand. On both hands of the defendant, the expert found an insufficient quantity of particles to state there was gunshot residue present from which the expert was unable to draw any conclusions. As to the victim, both hands were tested and nine particles were found on the right hand and six or seven particles were found on the left hand. Because of the tardiness of the request to examine the left hand of the victim, the expert was only able to perform a cursory examination of the left hand. During the cursory examination, the expert saw more than the six or seven particles but due to time constraints was only able to save the six or seven particles on the computer. When asked what conclusion could be drawn from the results of the tests on the victim’s left hand, the expert stated, “I can say that in all probability that person had either handled or been near a firearm when it was discharged.” On redirect examination the following conversation transpired when the prosecutor attempted to have the expert clarify his conclusion as to the tests performed on the victim’s hands.
“Q. Is your test basically saying that ... then that it does not help determine ... the particular location of anybody’s hands?
A. No, I would never venture to say that.
Q. O.K. It merely indicates that they were in close proximity to a firearm that had been shot, or they had, in fact, fired a firearm?
A. That’s correct.”
The expert’s statement that it was possible that the victim handled the gun, or was near the gun when it was discharged, tends to support the defendant’s contention that the gun discharged when the victim grabbed the defendant’s hand holding the gun. However, the presence of gunshot residue on the hands of the victim could have resulted from the victim’s grabbing the part of his- body which had just been shot. The expert stated it was possible for *424 gunshot residue to be present on a person’s hand if he had grabbed or clutched a part of his body that had been shot at very close range. Miss West testified the victim, after being shot, grabbed himself with both hands. Similarly, the defendant, when testifying on what happened after the gun discharged, stated the victim grabbed his chest (the part of the body where the bullet entered) and staggered backwards.
A final point to be discussed is the testimony regarding the distance between the victim and defendant at the time of shooting. Miss West testified on direct examination a yard (three feet) separated the victim and defendant when the defendant touched the victim’s arm and the victim pulled away. The defendant then produced the gun and shot the victim. Terry Joe Franklin was accepted by the court as an expert in the field of firearms identification and testified the shot was fired from a distance of less than six inches from the victim’s body. The expert then admitted that it was more probable than not that it was fired only two to three inches away from the victim’s body. The testimony of the expert regarding the close proximity of the gun when fired to the victim’s body contradicts Miss West’s statement on direct examination that the victim and the defendant were a yard apart when the shot was fired.
However, on cross-examination Miss West apparently was less confident with her estimation of the distance separating the victim and the defendant at the time of the shooting. Miss West’s initial response when questioned on the distance separating the victim and defendant at the time of the shooting was, “I don’t know nothing about no foots, yards, or nothing like that, I’m just ... in my mind, saying off my head, I don’t know.” The defense counsel received an answer from Miss West by physically positioning himself until he was at an appropriate position to demonstrate the distance between the victim and defendant at the time of the shooting. Because the answer was received in response to a physical demonstration, it is impossible to determine Miss West’s answer regarding the proximity of the victim to the defendant at the time of the shooting. The point of the above discussion was to reveal the apparent uncertainty of Miss West when she approximated the distance separating the victim and defendant at the time of the shooting.
The jury was faced with conflicting testimony as to the events of February 19, 1987. Apparently the jury found Miss West’s version of the facts more credible than the defendant’s version. When deciding a sufficiency question in State v. Harvin, 437 So.2d 983 (La.App. 3rd Cir.1983), this court first cited Jackson, supra, and then stated:
“When there is conflicting testimony as to the factual matters, evaluation of the credibility of the witnesses is within the sound discretion of the trier of fact and his determinations will not be disturbed unless clearly contrary to the evidence.” See also State v. Klar, 400 So.2d 610 (La.1981).
Although Miss West’s testimony was partially contradicted, the jury apparently believed her version over defendant’s version. As it cannot be said the jury’s verdict is clearly contrary to the evidence, their factual determinations should not be disturbed on appeal. Therefore, this assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 2:
In this assignment of error, defendant contends that the trial court erred in refusing to instruct the jury on the defense of negligent homicide. In his brief defense counsel asserts he requested negligent homicide be included as a responsive verdict and the jury be properly charged. According to defense counsel the trial judge refused his request and advised counsel only those responsive verdicts listed in La. C.Cr.P. art. 814 would be given.
La.C.Cr.P. art. 807 provides, in pertinent part, “The state and the defendant shall have the right before argument to submit to the court special written charges for the jury_” A review of the record, particularly the page defense counsel refers to in his brief, reveals the absence of a clear request that a special charge be given on *425 negligent homicide. Even if the discussion is deemed a request for a special charge on negligent homicide, the record does not indicate defense counsel’s compliance with art. 807’s requirement of a written charge. The jurisprudence of this state has consistently indicated that when special jury charges are not reduced to writing for presentation to the court, a trial judge may properly refuse to give such a charge to the jury. State v. Hamilton, 459 So.2d 216 (La.App. 3rd Cir.1984). As defense counsel failed to comply with the requirements of art. 807, the trial court committed no error in refusing to instruct the jury on negligent homicide. Therefore, this assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 3:
Finally, defendant contends her 12 year sentence on the manslaughter conviction is excessive. There are two prongs to an excessive sentence claim. First, an appellate court must be satisfied with the trial court’s application of La.C.Cr.P. art. 894.1. Second, an appellate court must determine if the sentence is excessive, in that it is nothing more than the purposeless and needless imposition of pain or it is grossly out of proportion to the severity of the crime.
The trial judge is required by art. 894.1 to state in the record the considerations taken into account in imposing sentence and provide a factual basis for the sentence. While the trial judge is not required to articulate every factor enumerated in art. 894.1, the record must reflect that the trial court adequately considered all the factors in particularizing the sentence to the defendant. State v. Cottingin, 476 So.2d 1184 (La.App. 3rd Cir.1985); after remand, 496 So.2d 1379 (La.App. 3rd Cir.1986). Consideration must be given to not only the aggravating factors which support incarceration but also the mitigating factors. State v. Smith, 426 So.2d 738 (La.App. 3rd Cir.1983); after remand, 445 So.2d 156 (La.App. 3rd Cir.1984).
Elements to consider in particularizing the sentence to defendant are “... the convict’s personal history (age, family ties, marital status, health, employment record), prior criminal record or absence thereof, seriousness of the particular offense and the likelihood of recidivism or rehabilita-tion_” State v. Soco, 441 So.2d 719 (La.1983); after remand, 508 So.2d 915 (La. App. 4th Cir.1987). A trial court’s failure to adequately comply with art. 894.1 will not necessitate remand if the record illumines and supports the sentencing choice. State v. Jones, 478 So.2d 764 (La.App. 3rd Cir.1985). An application of the above cited principles to the instant case supports the conclusion that the trial judge adequately complied with art. 894.1 by applying the factors and stating a factual basis for the sentence.
Turning to the second prong of an excessive sentence claim, it must be decided whether the sentence in the instant case is nothing more than the purposeless and needless imposition of pain and suffering or is grossly out of proportion to the severity of the crime. In 1974, art. 1, Section 20 of the Louisiana Constitution was amended to prohibit excessive punishment as well as cruel and unusual punishment. On appeal a defendant may raise the issue of excessive sentence even though his sentence is within the statutory limits. State v. Sepulvado, 367 So.2d 762 (La.1979).
An excessive sentence is one which “(1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime.” State v. Telsee, 425 So.2d 1251 (La.1983). In reviewing an excessive sentence claim, the appellate court should look to the reasons articulated by the trial judge for assistance in determining whether a sentence is excessive. State v. Bourgeois, 406 So.2d 550 (La.1981).
An appellate court, when reviewing an excessive sentence claim, must be mindful of the fact that wide discretion is granted to trial judges in the imposition of sentences within statutory limits and a sentence will not be set aside as excessive absent a manifest abuse of discretion. *426 State v. Meshell, 473 So.2d 935 (La.App. 3rd Cir.1985).
The initial focus in reviewing an excessive sentence claim should be on the nature of the offense and the offender. At this state of the analysis, a review of the trial court’s application of the factors enumerated in art. 894.1 is helpful. While the lack of any prior criminal record indicated the defendant would probably not commit another crime if placed on probation, the trial court could not be certain defendant would not commit another crime. According to the court, the seriousness of the crime indicates defendant is in need of correctional treatment and custodial environment that can be provided most effectively by commitment. The court also concluded a lesser sentence would deprecate the seriousness of the crime as a human life was unjustifiably taken.
Turning to the factors listed in paragraph B of art. 894.1, the court concluded defendant’s conduct did cause serious harm as it took the life of the victim. With respect to the next factor, the court stated it is inconceivable to think someone who approaches another with a gun does not contemplate causing serious harm. If defendant’s version of the facts is believed, there was some provocation by the victim. However, the court concluded that the provocation was not sufficient to justify the killing of the victim. Likewise, the court concluded that there were no substantial grounds tending to excuse defendant’s conduct. Again, if the defendant’s version is accepted as true the victim did facilitate its commission by grabbing the defendant’s hand. The court, however, concluded defendant could have avoided the confrontation.
The sixth factor, compensation to the victim, is inapplicable. The fact that defendant has led a law-abiding life up until the commission of this crime was given due weight by the trial court. The trial court conceded that it was probably unlikely that the circumstances leading to this crime would recur. Additionally, the court admitted defendant was likely to respond affirmatively to probation. Finally, the court concluded that the imprisonment of defendant would entail a great deal of hardship to defendant and her two children.
In addition to looking at the nature of the offense and the offender in analyzing an excessive sentence claim, a court may compare the sentence imposed with sentences received by other defendants convicted of similar crimes. State v. Telsee, supra. In State v. Tompkins, 429 So.2d 1385 (La.1982), the defendant was sentenced to serve 15 years at hard labor on a manslaughter conviction. On appeal defendant alleged the sentence was excessive. The defendant operated a lounge at which a fight erupted between two patrons. After breaking up the fight, the defendant escorted the two customers outside. The defendant was then informed by one of the two customers that the other had a knife. Defendant armed himself with a pistol, approached the victim, three times demanded the victim drop the knife, and then shot the victim when he failed to drop the knife. While there were several mitigating factors which weighed in defendant’s favor, the trial judge imposed a 15 year sentence. The Supreme Court held the trial judge had not abused his wide discretion and noted the killing was “senseless and with little provocation.” State v. Tompkins, supra.
Many of the same mitigating factors found present in Tompkins, supra, are also present in the instant case. Both defendants had no previous criminal record, the imprisonment of both would entail a great deal of hardship to the defendants’ families, and the trial judges in both cases felt it was unlikely that the defendants would commit another crime and they would likely respond affirmatively to probation. Given the similarity of mitigating factors and seriousness of the crimes in the instant case and Tompkins, supra, it is difficult to be sympathetic to defendant’s excessive sentence claim as she received three years less than the defendant in Tompkins, supra.
A second and final comparison case is State v. Burton, 464 So.2d 421 (La.App. 1st Cir.1985), writ denied, 468 So.2d 570 (La. 1985), in which the defendant was charged *427 with second degree murder. Following a jury verdict of guilty of manslaughter, defendant was sentenced to serve 13 years at hard labor, and an additional term of two years at hard labor, without benefit of probation, parole or suspension of sentence. As the trial judge had adequately complied with art. 894.1, the First Circuit upheld the sentence as it was well within the permissible range of sentences and did not constitute a constitutionally excessive sentence. State v. Burton, supra. The defendant in Burton, supra, received a sentence of 15 years and the defendant in the instant case complains of having been sentenced to 12 years.
After considering the nature of the offense, the offender, and the comparison cases, we find that the sentence is not excessive. Therefore, this assignment of error lacks merit.
Accordingly, for the reasons assigned, the conviction and sentence imposed by the lower court is affirmed.
AFFIRMED.