703 So.2d 653 (1997)
STATE of Louisiana
v.
John Daniel CORLEY.
No. CR97-235.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1997.
*656 Don M. Burkett, Many, H. Melissa Sugar, Asst. Dist. Atty., Mansfield, for State.
Jerome Winsberg, New Orleans, for John Daniel Corley.
Before SAUNDERS, WOODARD and GREMILLION, JJ.
*657 WOODARD, Judge.
On September 12, 1989, the defendant, John D. Corley, was indicted for the second degree murder of his wife, a violation of La.R.S. 14:30.1. Because of the unavailability of a key witness, the defendant's first trial ended in a mistrial during jury selection on January 17, 1990. The defendant's second jury trial resulted in a conviction as charged on April 7, 1990.
On October 2, 1991, on appeal to this court, the defendant's conviction was reversed and a new trial was ordered because the jury instructions contained an unconstitutional intent instruction. State v. Corley, 587 So.2d 193 (La.App. 3 Cir.1991), writ denied, 590 So.2d 1199 (La.1992). The defendant's third jury trial resulted in another second degree murder conviction on May 15, 1992. On appeal, this court affirmed the defendant's conviction. State v. Corley, 617 So.2d 1292 (La.App. 3 Cir.1993).
Upon the defendant's application for writ of certiorari, the supreme court reversed the defendant's conviction and sentence, finding that a statement given by him shortly after his arrest was improperly elicited from the defendant after he had invoked his right to counsel. State v. Corley, 93-1934 (La.3/11/94), 633 So.2d 151. Finding that the erroneous admission of the statement into evidence was not harmless error, the court remanded the case for further proceedings.
Upon remand, the defendant was again convicted of second degree murder by a jury on April 19, 1996. On June 19, 1996 and June 20, 1996, the defendant filed a Motion for Post Verdict Judgment of Acquittal, a Supplemental Motion for Post Verdict Judgment of Acquittal, and a Motion for New Trial. The trial court denied all motions on July 8, 1996. On July 12, 1996, the defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant now appeals his conviction and sentence, alleging seventeen (17) assignments of error. We affirm.

FACTS
On the night of July 20, 1989, the defendant and the victim went to the house of Charles Corley, the defendant's father, to discuss land upon which to build a house. According to Mr. Corley, the defendant was drinking. Glenda, the victim as well as the defendant's wife, also fixed herself a drink. While sitting on the couch, the defendant apparently jerked his arm and hit her in her neck, which was still hurting from a previous wreck. She retrieved her purse and walked out the door as if she were going home. The defendant stayed on the couch, talking with his father.
According to Patty Corley, the wife of Charles Corley, she and her stepdaughter, Rachel, went out after Glenda to see if she needed to talk. Glenda told Mrs. Corley that she still loved the defendant but did not know if she could stay with him if he did not quit drinking, and that if the defendant ever hit her, she would fight back. When asked why she went outside to talk with Glenda, Mrs. Corley stated she wanted to try to calm her down. After about an hour, Mrs. Corley and Glenda went back inside. Glenda went to the bathroom to get the defendant. As they were leaving, he asked for his drink, and, according to Mrs. Corley, Glenda had a disgusted look on her face. Glenda was driving when she and the defendant left the house.
In the early morning hours of the following day, the defendant's grandmother, Muriel Ora Corley (Muriel), heard a loud banging at her front door. When she went to the door, the defendant hollered for her to come see about Glenda. Muriel went with him to the car, where she saw Glenda sitting on the floor with her head and arm on the seat. The defendant picked Glenda up to take her inside. When he reached the doorsteps, he tripped and dropped her on the floor. He started giving her artificial resuscitation as fast as he could. At that point, Muriel called Charles Corley.
Even though Mr. Corley told his son that Glenda was dead, he continued to give her artificial resuscitation. He would cry a little, and then return to giving her the resuscitation. Mr. Corley asked him what happened, *658 but he never answered him. Mr. Corley told Muriel to call Scott, the defendant's brother, and the sheriff's department. Muriel put a gown on Glenda's body and moved her to the couch. The defendant just sat on the couch, holding Glenda's foot and telling her that he loved her.
Officer Tommy Sandel was the first officer to respond to the call from the Corley residence. Most of the time that Officer Sandel was there, the defendant sat in a chair next to the couch with his hand on Glenda's body. According to the Officer, the defendant was not saying anything. When Officer Sandel arrived at the residence, the defendant was wearing tight fitting blue jean shorts. Officer Sandel testified that while there, the defendant called to his father and pointed to his left ring finger, where there was no ring.
The defendant was taken from the residence to the sheriff's department. After examining his vehicle and finding very sticky mud on the mud flaps, Officer Sandel and Detective Bobby Brumley traveled to a nearby location where that mud could be found, Blackland Road. They saw tracks going in and out of the road. The tracks were the same wheel base and had the same tread as the defendant's vehicle. Officer Sandel returned to the road after daylight and found a pair of ladies panties balled up. He also saw scuff marks in the road and in the ditch.
James McComic, a former investigator for the Sabine Parish Sheriff's Department, also went to the Corley residence the night of the murder. While there, Officer McComic searched the inside of the defendant's vehicle. He found a partially empty fifth of Canadian Club, three empty Budweiser cans, and a tank top. After viewing photographs taken from the scene of the murder, he identified areas on the ground where a scuffle had likely taken place between people. Finally, Officer McComic testified that a pair of panties and a wedding band were found at the scene of the murder.
Deputy Jack Staton viewed photographs taken of the defendant on the night of the murder. According to the Deputy, the photographs show him with fresh scratches and bruises on his face, back, and legs.

ASSIGNMENTS OF ERROR
The defendant claims the following assignments of error:
1. The defense respectfully urges this Court to review the entire record in this matter for errors patent on the face of the record.
2. The verdict rendered by the jury at the defendant's trial, guilty of Second Degree Murder, is contrary to the law and evidence presented at trial. The evidence adduced at the trial is constitutionally insufficient to sustain a verdict of Second Degree Murder.
3. The trial judge erred in refusing to allow the defendant to present evidence of his wife's infidelity in its maintaining of the state's Motion in Limine. As a result, the defendant was precluded from presenting a legal defense to which he is entitled by the Constitution. The Motion in Limine should not have been granted.
4. The defendant's indictment should have been quashed as the defendant's third trial did not begin until April 15, 1996, more than one year after the Louisiana Supreme Court Judgment of March 11, 1994, reversing the defendant's conviction. The statutory time limitation for commencement of a new trial after the reversal had lapsed.
5. The trial judge erred in failing to cause the District Attorney to provide the defendant with testimony of witnesses who appeared before the grand jury. The defendant was, therefore, denied the ability to gather impeachment evidence against specified state witnesses. The defendant's Motion to Examine Grand Jury Transcript should have been granted in one form or another.
6. The trial judge erred in refusing to modify the defendant's jury verdict of guilty of second degree murder to a verdict of guilty of manslaughter. The ends of justice require that said modification should have been granted *659 through the defendant's Motion for Post Verdict Judgment of Acquittal.
7. The trial judge erred in failing to quash the grand jury indictment returned against the defendant. The district attorney's secretary should not have been a member of that panel.
8. La.R.S. 14:30.1 is constitutionally deficient in that it offers no definition of "great bodily harm." That statute should be declared unconstitutional as applied to the defendant.
9. The trial judge erred in failing to charge the jury on the legal aspect of "great bodily harm."
10. The trial judge erred in his instructions to the jury on manslaughter, La. R.S. 14:31.
11. The trial judge erred in his instructions to the jury in that he did not fully explain the Louisiana law of manslaughter.
12. The trial judge erred in failing to instruct the jury on the Louisiana law of "intoxication."
13. The trial judge erred in failing to instruct the jury as to the Louisiana law of second degree battery.
14. The trial judge erred in his instruction to the jury on "reasonable doubt." His instruction was contrary to the law.
15. The trial judge erred in his instructions to the jury on how the jury should interpret the evidence. His charge that the jury should consider only "evidence and proof presented at the trial" is contrary to the law of our state. The jury was not instructed that it could consider the "lack of evidence" in the case.
16. The ends of justice require that the defendant's conviction be amended to that of guilty of manslaughter.
17. The defendant's attorneys failed to represent him to such an extent that they were constitutionally ineffective.

LAW

ASSIGNMENT OF ERROR NUMBER 1
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. The record contains no errors patent.

ASSIGNMENT OF ERROR NUMBER 2
The defendant claims that the verdict rendered by the jury is contrary to the law and evidence, but concedes that the evidence may be sufficient to support a verdict of manslaughter. He argues that the evidence was not sufficient to prove he specifically intended to kill his wife and claims at least two reasonable theories of innocence were presented to the jury: "Firstly, that the defendant was reasonably provoked into his actions, and secondly, that the defendant committed only a second-degree battery against his wife and had no specific intent to kill or inflict great bodily harm." The defendant also claims it is unclear whether the victim's injuries constituted "serious bodily injury" or "great bodily harm" and that "[a]ny resolution or conclusion as to whether Glenda's injuries were `great' or `serious' should be resolved in favor of the defendant." Finally, he urges that the victim's injuries alone were not enough to prove specific intent to kill.
"Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." State v. Carroll, 95-859, p. 4 (La.App. 3 Cir. 1/31/96), 670 So.2d 286, 288. "Specific criminal intent is a state of mind and need not be proven as fact, but may be inferred from the circumstances present in the case and from the action of the defendant." Id. at 289. The severity of the attack on the victim is an indicator of the defendant's specific intent to kill. State v. Myers, 584 So.2d 242 (La.App. 5 Cir.), writ denied, 588 So.2d 105 (La.1991), cert. denied, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); State v. Segura, 464 So.2d 1116 (La. App. 3 Cir.), writ denied, 468 So.2d 1203 (La.1985).
Dr. George M. McCormick, II, an expert in the field of forensic pathology, testified *660 as to his findings in autopsying the victim's body. When asked the cause of the victim's death, he testified as follows:
A. A combination of multiple injuries. First of allalong withor associated with the bruises on her headshe had extensive hemorrhage uh, beneath the scalp and she had hemorrhaged around her brain. She did not have a skull fracture, but the injuries that we saw with the hemorrhage around her brain were consistent with multiple blows to the headwhich were evidenced by the wounds on her face, ears and sides of her head. In addition, she had evidence that her airway had been cut off. She had uh, hemorrhage in the tissue beneath the skin unbeneath the abrasionsor the scraping of the skin on the front of her neck, she had small air pockets which had blown out on the surfaces of her lungand this is an indication that at some point and time her airway was shut offshe had a closed column of airor amount of airwithin her airwayfrom upper airway into her lungsand that as she was struggling to breathein fact, chokinguh, that the pressure blew out these air bubbles on the surface of her lungs. This is an indication that she was uh, breathing against a closed airway. Taken in conjunction with the marks around her neck, are consistent with her being strangled. She had both injuries to her brain, the injuries to her airway, consistent with strangulation. I have to consider both together as part of the cause of death. Of the two, the airway obstruction was slightly more severe. It is possible that she could have survived the wounds in her brain, uh, but not possible to survive with the airway cut off.
According to Dr. McCormick, the victim was most likely strangled to death. Later, he testified that the victim died as a result of a severe beating as well as strangulation. On cross-examination, he said that the injuries found on the victim's body, particularly the torso, could have been made during a struggle. When asked if there was any way he could conclude whether or not the garment used to strangle the victim was on or off when she was strangled, he remarked:
[I]t's easy to make the marks, if the garment is on her neck because the stitching is on the inside of the neckband and the stitch pattern is seen both on the front and back of her neck, however, it's also possibleonce the garment is taken offfor someone to use it as a noose to put back around her neckagain with the stitching towards the skin and use it to tighten around the throat and strangle her.
Finally, he noted that at some point the victim was unclothed since there was dust over her entire body.
Dr. Gerald Liuzza, accepted as an expert in forensic pathology on behalf of the defense, testified as to his findings from reviewing Dr. McCormick's report. When asked his opinion regarding the cause of the victim's death, Dr. Liuzza stated, "I think her death was due to one, or a combination of, blunt trauma to the head and strangulation." Dr. Liuzza further testified that the situation did not appear to be accidental. Defense counsel asked Dr. Liuzza if the "blow out injuries" to the victim's lungs could have been caused by someone administering CPR. Dr. Liuzza responded:
That depends on how you mean CPRuh, normally, you're not going to see that. I suppose if CPR were done by someone who was very strong and also not well trained or doing an extreme form of chest compressionvery rapid, forceful blows it would be possible to cause some rupturing of the walls of the air sacs, and that's usually accompanied by some leakage of blood cells alsoso that would be manifested as rupturing of the air sac walls and some recent hemorrhageif you were to look at the microscopies on the lungs.
Defense counsel then asked if Dr. McCormick had mentioned the victim's hyoid bond being fractured. Dr. Liuzza indicated that it was not in the report. When asked if that was something frequently seen in strangulations, the following colloquy took place:

*661 A. Uh, you certainly can see it. It depends a lot on the nature, the age of the person, and so on uh, the hyoid bond is fairly protected and it's also much more pliableable to bend in younger peopleso you're less likelyin a younger personto see a fractured hyoid as opposed to an older person. What you see more often even when the hyoid isn't fractured is bleeding, hemorrhage around the bone in the soft tissuesthe muscles and so onin the neck around the hyoid which is located in the neck around the point I'm indicating hereabove the voice box
Q. Did you see any of those signs in according to Dr. McCormick's report?
A. Dr. McCormick found only some bleedingwhich appeared to have been either in the skin or immediately below the skinbeneath the area of the bruising that he described on the outside of the neck.
Q. Not that deeper kind of bruising that you just testified about?
A. I saw nothing in his report that made me think of that type bleedingthe deeper bleedingno.
The testimony quoted above was sufficient to prove that the defendant acted with specific intent to kill or inflict great bodily harm when he killed the victim. In Myers, 584 So.2d at 249, the court stated, "[t]he severity of the attack on Janet Myers, in which she was bludgeoned to death with a baseball bat, indicates that the defendant had the specific intent to kill or to inflict great bodily harm when he struck her." In Segura, 464 So.2d 1116, the victim had been stabbed a total of fourteen (14) times to her back, chest, and brain. The court held that the "severity and number of wounds themselves allow for no other conclusion" but that the defendant had specific intent to kill or inflict great bodily harm. Id. at 1124. Likewise, the severity of the injuries sustained by the victim in the present case establishes that the defendant had the specific intent to kill or inflict great bodily harm.
Although the defendant claims that the evidence supports a finding of manslaughter because he was reasonably provoked, the defendant did not offer sufficient evidence to support such a finding. "To reduce second degree murder to manslaughter, defendant must present evidence to show by a preponderance that the homicide was committed in `sudden passion' or `heat of blood' immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection." State v. Journet, 629 So.2d 1387, 1390 (La.App. 3 Cir.1993). Although the defendant offered some evidence that the victim was upset with the defendant hours before the murder, no evidence was introduced as to the events immediately preceding the murder. Thus, no evidence was presented to show the murder was immediately caused by provocation.
The defendant also argues that the evidence supported a verdict of manslaughter because he committed only a second degree battery on the victim without any specific intent to kill or inflict great bodily harm. Because of the injuries sustained by the victim, we must disagree as we discussed above.
Finally, the defendant suggests:
The nature and degree of the injuries sustained by the victim is vitally important in determining the level of Mr. Corley's culpability. While the trauma inflicted may have been "great bodily harm", it was also acknowledged by the witnesses to be "serious bodily injury." Neither "great bodily harm" nor "serious bodily injury" was explained in any form to the jurors by the Court. There is no explanation to this dilemma in the evidence adduced. We just do not know what happened that tragic night. Any resolution or conclusion as to whether Glenda's injuries were "great" or "serious" should be resolved in favor of the defendant. The injuries standing alone cannot cause a rationed [sic] trier of fact to conclude that Mr. Corley had the requisite specific intent beyond a reasonable doubt.
The fact that the victim's injuries could be considered serious bodily injury does not prevent them from being considered great bodily harm. Furthermore, the defendant has not shown any difference between the two definitions. A precise definition of *662 "great bodily harm" does not have to be given to the jurors. State v. Smith, 447 So.2d 42 (La.App. 1 Cir.1984). The phrase "great bodily harm" has been held to be "sufficiently clear to meet the constitutional standard." State v. Mitchell, 412 So.2d 547, 550 (La.1982). Finally, the harm to this victim can be considered as nothing less than the ultimate harmdeath.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 3
The defendant claims that the "trial judge erred in denying the defendant to present evidence of his wife's infidelity in its maintaining of the state's Motion in Limine" filed on April 16, 1996 and that the exclusion of this evidence prevented him from "presenting a legal defense to which he is entitled by the Constitution." In its motion, the state sought to exclude evidence regarding the victim's premarital sexual encounter with the defendant's brother. The defense sought the admission of such testimony to show the defendant's state of mind on the night of the homicide, arguing that it was possible that the victim, "in a fit of anger," told the defendant about her previous encounter with his brother, which in turn provoked him into a fit of rage against her. After hearing argument from both parties, the trial court ruled as follows:
THE COURT: Well, I go [sic] ahead andmy ruling is what I've said and I'll reiterate it to make the point that uhthe evidenceevidence of the victim's prior sexual relationship with the defendant's brother is not relevant unless it can be connected up with the defendant's knowledge of the relationship. The fact that the victim had a sexual relationship with the defendant's brother has no bearing on this case unless it can be shown that the defendant had knowledge of this relationship and if the defense is not going to tell me that they are going to connect it up then I'm not going to allow it `cause I feel that it has no relevance without thewithout it being connected uh, to his knowledge showing that he had knowledge of this relationship. I'm not going to allow a witness to get on the stand and say uh, that she had sex with his brother without it being connected up I don't see the relevance and that's my ruling.
The trial court did not err in excluding the evidence since the defendant offered no evidence to show that he actually knew of the victim's previous sexual encounter much less that his knowledge of the encounter provoked him into killing his wife. The witnesses the defense proposed to call were going to testify as to the occurrence of the encounter, not the defendant's knowledge of the encounter.
In State v. Gachot, 609 So.2d 269 (La.App. 3 Cir.1992), writ denied, 617 So.2d 1180 (La. 1993), cert. denied, 510 U.S. 980, 114 S.Ct. 478, 126 L.Ed.2d 429 (1993), this court faced a similar issue. In Gachot, the defendant was found guilty of one count of manslaughter of his father and one count of second degree murder of his mother. On appeal, he assigned as error the trial court's exclusion of evidence concerning his relationship with his mother. The court stated the following:
Evidence was admitted which concerned defendant's problems with his father, and specific facts or accusations by the father. Defendant argues that this evidence established sufficient provocation to reduce the degree of homicide of the father to manslaughter, and if the trial court had admitted similar evidence concerning the mother a consistent verdict of manslaughter of the mother would have been returned.
The theory of defense was that Michael Gachot committed the crimes of manslaughter of his parents as a result of longterm mental abuse.
As this court noted in State v. Nugent, 580 So.2d 1002, 1004 (La.App. 3 Cir.1991), manslaughter is a homicide which would be second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Id., quoting State v. Lombard, 486 So.2d 106 (La.1986).
The important factor to note is the issue of time. The provocation discussed in the manslaughter statute must occur immediately before the offense. In the present *663 case, some of the utterances and actions by defendant's father which defendant claims were sufficient provocation did not occur shortly before the murders, but weeks and months earlier. Defendant's blood had an opportunity to cool. Therefore, these prior incidents should not have been admitted to prove the provocation sufficient to reduce defendant's culpability from seconddegree murder to manslaughter. Defendant did not establish any verbal or emotional abuse by his mother, nor did he make a proffer of such evidence.
Id. at 276. Likewise, in the present case, no evidence was introduced that the alleged provocation, i.e., the defendant's knowledge of his wife's prior sexual encounter, occurred shortly before the murder. Thus, the trial court did not err in its ruling.
In his brief, the defendant also argues that the trial court's exclusion of such evidence placed him in a position of being forced to give up his right not to testify, subjecting himself to cross-examination and impeachment by testimony from his previous trial. Since he did not testify, the defendant claims the exclusion of the evidence also infringed on his constitutional right to present a defense. This argument is without merit. In State v. Hill, 610 So.2d 1080, 1086 (La. App. 3 Cir.1992), the court stated:
In State v. Gremillion, 542 So.2d 1074 (La.1989), the court held that an otherwise inadmissible hearsay statement which does not fit into one of the recognized exceptions to the hearsay rule should be admitted if it is reliable and trustworthy and to exclude it would interfere with defendant's constitutional right to present a defense. In State v. Martin, 582 So.2d 306 (La.App. 1st Cir.), writ denied, 588 So.2d 113 (La. 1991), the court found that "even if the Louisiana Code of Evidence prohibits the introduction of certain testimony, in those rare cases where the evidentiary rule impermissibly impairs the defendant's right to present a defense, the evidence still should be admitted." The court then declined to apply this narrow jurisprudentially created exception to that particular case because it found that the defendants therein were not prohibited from presenting their defense. Constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value. State v. Scott, 588 So.2d 1365 (La.App. 2d Cir.1991), writ denied, 592 So.2d 1298 (La.1992).
The narrow exception, referred to above, should be sparingly applied and has only been applied in the Gremillion case where the court found the existence of exceptional circumstances in that, by not allowing the defendant to place the statement before the jury, the trial court impermissibly impaired his constitutional right to present a defense to the crime charged. The exception has not been applied to a case such as the one before us wherein defendant claims that his right against self-incrimination, i.e., to not testify if he so chooses, has been infringed.
This court found that the trial court did not err in excluding the statements because the defendant had not shown the statements were reliable and trustworthy.
As in Hill, the jurisprudential exception should not be applied to the present case. The defendant was not prevented from asserting a defense because of the trial court's exclusion of the evidence. Rather, he chose not to present that defense by refusing to testify. Nevertheless, even applying the exception to the case sub judice, the evidence should still be excluded. As stated in Hill, "[c]onstitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value." Id. at 1086. Because no evidence was introduced to show that the defendant knew of the previous sexual encounter and that this knowledge provoked him into killing his wife, the evidence was not probative to the issue before the jury.
The defendant further maintains that the trial court should not have allowed the state to file the Motion in Limine because it was not filed until the second day of voir dire. By the time the trial court ruled on the motion, the jury had been selected. On appeal, the defense claims its strategies during jury selection would have been different *664 had it known "one of its theories of the case had been severely hampered." The defendant further argues "the unfair surprise allowed the defense no time to re-plan the presentation of its case."
The defendant did not object to the state's filing of the motion based on untimeliness. Nor did the defendant request a continuance in order to prepare for trial without such evidence. The defendant did raise this issue in his Motion for New Trial, and argued it in a hearing on that motion. The trial court denied the motion without reasons. Even so, by failing to contemporaneously object to the filing of the allegedly untimely motion, and in failing to move for a continuance when the trial court granted the motion, the defendant did not preserve this issue for review. La.Code Crim.P. art. 841.
Although the defendant does not allege on appeal that the trial court erred in denying his Motion for New Trial on this basis, even if raised, the defendant has failed to show prejudice by the trial court's ruling. The trial court's granting of the State's Motion in Limine did not prevent the defendant from introducing the evidence. The defendant could have testified as to his knowledge of the information and as to whether the encounter enraged him before his wife's murder. Without his testimony, the evidence was simply not relevant. Notwithstanding, the defendant argues that the evidence could have been used by the jury to support the defense's hypothetical theory of the case that the night of the murder, the defendant may have learned of his wife's previous encounter, which provoked him into killing her. This theory was not sufficient to admit the evidence without some other testimony as to its relevancy.
For the foregoing reasons, this assignment of error also lacks merit.

ASSIGNMENT OF ERROR NUMBER 4
The defendant claims that the indictment should have been quashed as his third trial did not begin until April 15, 1996, more than one year after the Louisiana Supreme Court's judgment of March 11, 1994, reversing his conviction. La.Code Crim.P. art. 582 provides:
When a defendant obtains a new trial or there is a mistrial, the state must commence the second trial within one year from the date the new trial is granted, or the mistrial is ordered, or within the period established by Article 578, whichever is longer.
La.Code Crim.P. art. 581 governs the effect of the expiration of the time limitations set forth in Article 582:
Upon the expiration of the limitations established by this Chapter, the court shall, upon motion of the defendant, dismiss the indictment. This right of dismissal is waived unless the motion to quash is made prior to trial.
If the indictment is dismissed under this article, there shall be no further prosecution against the defendant for the same or a lesser offense based on the same facts.
No motion to quash the indictment was filed by the defendant. The defendant did not raise this issue until he filed his Motion for New Trial. Thus, the defendant waived his right of dismissal. See also State v. Frith, 436 So.2d 620 (La.App. 3 Cir.1983).
Furthermore, the defendant filed three motions to continue on January 26, 1995, October 4, 1995 and October 11, 1995. A motion to continue filed by a defendant suspends the time for commencing trial until it is decided. State v. Jones, 94-1142 (La. App. 3 Cir. 4/5/95), 653 So.2d 109, writ denied, 95-1055 (La.9/29/95), 660 So.2d 856. According to La.Code Crim.P. art. 580, the state has no less than one year after the ruling on a preliminary motion to commence trial. Thus, even if the defendant had filed a motion to quash, the motion would have lacked merit since the state had until one year after the court's ruling on the last of these motions, which was October 26, 1995.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER 5
The defendant urges that the "trial judge erred in failing to cause the District Attorney to provide the defendant with testimony of witnesses who appeared before the grand jury." Thus, says the defendant, he was denied the ability to gather impeachment evidence against certain state witnesses.
*665 On March 18, 1996, he filed a motion to examine grand jury transcripts, alleging that the testimonies of Officers Sandel, Staton, and McComic contained inconsistencies and contradictions. Thus, he wanted the witnesses' grand jury testimonies for impeachment purposes.
At the hearing on that motion, the defense attorney stated that the motion was moot for the following reason, "I have been advised by the District Attorney's Officeand I realized at the time that I filed the motion that it was not their practice then, probably not even nowto record and uh, transcribe grand jury testimonyand I have been advised that was the case in this case so that, that motion is moot." However, the defendant re-urged the motion at his hearing on the Motion for New Trial. He stated:
The motion to examine grand jury transcripts was filed for the purpose of gathering impeachment material that the defendant has previously point [sic] out to the courtit was not supplied and the reason was that this grand jury testimony was not transcribeduh, there are cases saying if they got it you get it. Unfortunately, there's no statute requiring grand jury testimony be transcribed, however, uh, there are several standardsamong those ABA standardsthat state that whenever the prosecution oriented hearings take place that they be transcribed for the protection of both sides.
The trial court denied the defendant's motions without reasons.
Although the defendant may have waived review of this claim by claiming that it was moot prior to trial and thereby failing to contemporaneously object, the court has addressed the issue since it was again raised at the defendant's hearing on his motion for new trial. Generally, grand jury proceedings are to be kept secret. State v. Ates, 418 So.2d 1326 (La.1982). However,
[w]hile there may be instances in which a party's need for grand jury materials outweighs the need for continued secrecy, that need must be demonstrated `with particularity'. That is, the party seeking disclosure must prove that without access to the grand jury materials the party's case would be `greatly prejudiced' or that an `injustice would be done.' Furthermore, a general wholesale request for transcripts does not satisfy the requirement of demonstrative particularized need.
State v. Trosclair, 443 So.2d 1098, 1103 (La. 1983), cert. dismissed, 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984).
In Ates, the court found that the defendant had not made such a particularized showing because "[t]he request by the defendant merely sought to ascertain whether any such inconsistent statements existed." Ates, 418 So.2d at 1330. In the present defendant's motion to examine the grand jury transcripts, the defendant stated:
Defendant maintains that Officers Sandel, Staton and McComic have repeatedly contradicted themselves and each other under oath during the course of criminal proceedings in connection with defendant's case, and that a great likelihood exists, that accordingly, said officer's testimony before the grand jury which indicted defendant are inconsistent with the officers' testimony during subsequent proceedings.
(Emphasis added).
As in Ates, the defendant in the present case merely sought to ascertain whether any inconsistent statements existed in the grand jury transcripts. Thus, the defendant did not meet his burden of proving a particularized need for the transcripts, even if they existed.
For the foregoing reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 6
In this assignment, the defendant states that "the trial judge erred in refusing to modify the [D]efendant's jury verdict of guilty of second degree murder to a verdict of guilty of manslaughter. The ends of justice require that said modification should have been granted through the defendant's Motion for Post Verdict Judgment of Acquittal." The defendant refers to the law and argument set forth in Assignment of Error Number 2.
La.Code Crim.P. art. 821 provides that "[a] post verdict judgment of acquittal shall be *666 granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." For the same reasons discussed in assignment of Error Number 2, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 7
The defendant claims that "the trial judge erred in failing to quash the grand jury indictment returned against the defendant. The District Attorney's secretary should not have been a member of that panel." The same assignment of error has been addressed by this court in one of the defendant's prior appeals. Corley, 617 So.2d 1292. After an extensive discussion, this court stated the following:
Not only did the defendant suffer no prejudice from Ms. Arthur serving on the grand jury, the defendant also failed to establish a specific statutory provision to disqualify the district attorney's secretary from service on the grand jury. For these reasons, the trial court did not err in denying defendant's motion to quash the indictment on these grounds.
Id. at 1300. Since the defendant has not raised any additional arguments on this issue, the assignment of error lacks merit for the same reasons discussed in the defendant's prior appeal.

ASSIGNMENT OF ERROR NUMBER 8
The defendant contends that "La. R.S. 14:30.1 is constitutionally deficient in that it offers no definition of `great bodily harm.'" Specifically, the defendant claims that the statute "fails to give him notice of what the state is charging him with, to enable him to prepare and present a defense; is vague; and should be declared unconstitutional as applied to him." This issue was addressed by the supreme court in State v. Mitchell, 412 So.2d 547 (La.1982). In that case, the court stated:
Defendants contend that LSA-R.S. 14:30.1 is unconstitutionally vague because the phrase "inflict great bodily harm" is too indefinite to provide a clear standard. The trial court denied the motion as untimely and also because the phrase in question has an understandable meaning.
If an indictment has a substantive defect, a mistrial shall be ordered even after trial has begun. LSA-C.Cr.P. art. 487. Thus, the question of timeliness is irrelevant.
"The constitutional guarantee that an accused shall be informed of the nature and cause of the accusation against him requires that penal statutes describe unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto." State v. Payton, 361 So.2d 866 at 871 (La.1978). The phrase in question is sufficiently clear to meet the constitutional standard.
This assignment lacks merit.
Id. at 550.
For the same reasons, this assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBERS 9-13
The defendant argues the following assignments of error in this assignment: 9) The trial judge erred in failing to charge the jury on the legal aspect of "great bodily harm"; 10) The trial judge erred in his instructions to the jury on manslaughter, La.R.S. 14:31; 11) The trial judge erred in his instructions to the jury in that he did not fully explain the Louisiana law of manslaughter; 12) The trial judge erred in failing to instruct the jury on the Louisiana law of "intoxication"; and 13) The trial judge erred in failing to instruct the jury as to the Louisiana law of Second Degree Battery. For the reasons below, these assignments lack merit.

Number 9
First, the defendant did not request that such an instruction be given. La.Code Crim.P. art. 807 provides in pertinent part: "The state and the defendant shall have the right before argument to submit to the court special written charges for the jury." In State v. Love, 535 So.2d 420 (La.App. 3 Cir. 1988), this court found that the trial court did not commit error in refusing to instruct the jury on negligent homicide when the defendant failed to file a written request for such a charge. In that case, there was some discussion *667 which may have contained a request for such a charge, but this court stated,
[e]ven if the discussion is deemed a request for a special charge on negligent homicide, the record does not indicate defense counsel's compliance with art. 807's requirement of a written charge. The jurisprudence of this state has consistently indicated that when special jury charges are not reduced to writing for presentation to the court, a trial judge may properly refuse to give such a charge to the jury.
Id. at 425.
In the present case, the record does not indicate that any request, written or oral, was made concerning instructing the jury on the definition of "great bodily harm." Thus, the trial court did not err in refusing to include such an instruction. Furthermore, the defendant did not object to the lack of such a definition; thus, he is precluded from now raising this claim on appeal. La.Code Crim.P. art. 841.
In Smith, 447 So.2d 42, the court held that a precise definition of "great bodily harm" did not have to be given to the jury even when the jurors themselves requested one. The trial court "instructed the jury that there was no precise legal definition of `great bodily harm,' and therefore, the term would have to be defined by each juror in accordance with his own best experience." Id. at 44. Thus, this assignment lacks merit.

Number 10
The defendant claims that the trial court erred in failing to define provocation, sudden passion, heat of blood, or specific intent. However, the court did instruct the jury on the definition of specific intent. Once again, the defendant did not request any special charge for manslaughter. Furthermore, the defendant failed to object to the trial court's instruction on manslaughter. He did object after the trial court denied his request for a proposed special jury instruction on reasonable doubt, which was the only special instruction he requested This sole objection was not sufficient to preserve his objection to all the jury instructions. Thus, the defendant has not preserved this claim for review for failure to request a special instruction and for failure to object to the court's charge. La.Code Crim.P. arts. 807 and 841.

Numbers 11 and 13
The defendant claims:
[T]he overall manslaughter instruction's principal deficiency was the failure to charge the jury on second-degree battery and its elements, regarding (A)(2)(a). As mentioned above, the Court merely tracked the language of the statute ... and in no way specified which non-enumerated felony or misdemeanor the jury was to consider, nor what its elements were.
The defendant cites State v. Wade, 508 So.2d 114 (La.App. 4 Cir.1987), in support of his argument. In that case, a mother was charged with manslaughter for the death of her three-month-old baby. The crime of cruelty to juveniles was the predicate felony for the manslaughter charge. As soon as the jury retired, defense counsel objected to the trial judge's failure to define the applicable standard of criminal negligence. The trial judge overruled the objection because the defendant failed to make a written request for the special charge. On appeal, the court stated the following:
Because the crime of cruelty to juveniles is the predicate felony offense for the manslaughter charge, and because the State was attempting to prove that the defendant's actions or inactions toward her child were either intentional or criminally negligent, the trial judge should have fully informed the jury of the elements of the predicate crime by defining the standard of criminal negligence as set forth in LSA-R.S. 14:12. Because the judge failed to charge the jury concerning this standard, it is conceivable that the jury applied some lesser degree of negligence in determining that the defendant had committed cruelty to a juvenile and that the child's death had resulted during her perpetration of this predicate offense. Accordingly, we conclude that this incomplete charge tainted the jury's verdict.
Id. at 117. (footnote omitted).
The court further concluded that the defendant's failure to file a written request for *668 the special jury charge did not preclude him from seeking review since he objected to the charge immediately after the jury retired and since "[a] full definition of this predicate offense, including the standard of criminal negligence, was an essential element of the offense in this case." Id.
Wade is distinguishable since the requested special charge in the present case the elements of second degree battery as a predicate offense to manslaughterdid not involve an essential element of the offense charged. The offense charged was second degree murder. Unlike the state in Wade, the state in the present case was not relying on second degree battery as a predicate offense of manslaughter. Rather, the state was attempting to prove the elements of second degree murder. Furthermore, the defendant failed to object to the trial court's failure to include such an instruction in its charges.
Again, the defendant did not request such a charge be given nor did he object to the charge given by the court. Thus, he is precluded from now raising the claim on appeal. For these reasons, these assignments of error lack merit.

Number 12
Failure to instruct as to the defense of voluntary intoxication is not properly before this court for review, since the defendant failed to specifically request such an instruction in writing, and the defendant failed to object to the exclusion of such an instruction in the court's charges. La.Code Crim.P. arts. 807 and 841.
For the foregoing reasons, assignments of error numbers 9-13 lack merit.

ASSIGNMENTS OF ERROR NUMBERS 14 AND 15
The defendant complains that the trial court erred in his instructions on how the jury should interpret the evidence. The defendant argues, "[h]is charge that the jury should consider only `evidence and proof presented at trial' is contrary to the law of our state. The jury was not instructed that it could consider the `lack of evidence' in the case." La.Code Crim.P. art. 804 provides in pertinent part:
A. In all cases the court shall charge the jury that:
(1) A person accused of crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;
(2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and
(3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.
The contested portion of the trial court's instructions in the present case reads as follows:
In all criminal cases, the State must prove every element of the crime charged or of a crime included therein beyond a reasonable doubt. This burden of proof is always on the State.
If you have a reasonable doubt as to any element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty, even where the evidence demonstrates a probability of guilt. If it does not establish such guilt beyond a reasonable doubt, you must find the defendant not guilty. While the State must prove the guilt of the defendant beyond a reasonable doubt, it is not required to prove his guilt to absolute certainty. It is sufficient that the State prove the guilt of the defendant beyond a reasonable doubt. You, the jury, must decide whether the State has proven the guilt of the defendant beyond a reasonable doubt.
A reasonable doubt not a mere possible doubt. It should be an actual doubt. It is such a doubt as a reasonable person would seriously entertain. It is a doubt that one could give a reason for. It is an honest misgiving or doubt arising from the proof or lack of proof in the case.

*669 The only proof or evidence you may consider is that evidence or proof presented in this trial. The evidence which you should consider consists of the testimony of the witnesses and of exhibits such as writings and physical objects which the Court has permitted the parties to introduce. You must not consider any evidence which has not been admitted or which you were instructed to disregard or to which an objection was sustained. You alone shall determine the weight and the credibility of the evidence.
The defendant maintains that the trial court erred in failing to follow Article 804 and also in instructing the jury that they were limited to a consideration of the evidence presented at trial.
First, this issue is not properly before the court. Once again, the defendant did not file a written charge requesting such an instruction nor did he object to the instruction given by the trial court. The only proposed charge given by the defendant was the following, "To prevail in proving a case beyond a reasonable doubt jurors must reach a subjective state of near certitude of the guilt of the accused." The defendant objected to the court's exclusion of this charge. No request was made that the trial court instruct the jury in compliance with Article 804 nor was any objection made as to the trial court's failure to give such a charge.
In State v. Simmons, 443 So.2d 512 (La. 1983), the court considered this very issue waived because of the defendant's failure to object to the charges given by the court even though the defendant had requested an Article 804 charge to be given. The trial court denied the defendant's special request but the defendant failed to object to the trial court's non-compliance with Article 804 either before or after the jury retired. The present facts are even stronger since the defendant neither filed a special request for such a charge nor objected to the trial court's failure to give such a charge. Thus, we find the defendant has waived consideration of this issue.
Nevertheless, the trial court's instructions were in compliance with Article 804. The case relied on by the defendant, State v. Mack, 403 So.2d 8 (La.1981), held that the reading of the exact language of Article 804 was mandatory. In State v. Rault, 445 So.2d 1203 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984), 481 U.S. 1042, 107 S.Ct. 1987, 95 L.Ed.2d 826 (1987), "after" (La.1984), the court found that "Mack's directive must be modified to approve either a reading of Article 804 or the giving of instructions substantially equivalent to the statute." Id. at 1212. Thus, the fact that the trial court did not use the exact wording of Article 804 does not render the instruction invalid. The instruction substantially complied with Article 804.
The trial court instructed the jury that a reasonable doubt is "an honest misgiving or doubt arising from the proof or lack of proof in the case." (emphasis added). The trial court went on to instruct the jury that "the only proof or evidence you may consider is that evidence or proof presented in this trial." The defendant claims the latter instruction was erroneous because it instructed the jury to consider only the evidence presented at trial rather than the lack of evidence in determining reasonable doubt. However, the trial court's instruction limiting the jury's consideration to evidence presented at trial was not pertaining to the jury's determination of reasonable doubt. Rather, it was instructing the jury to not consider evidence from outside sources.
In Mack, the instruction "specifically limited the jurors to the evidence before them to support a reasonable doubt and prohibited them from going outside the trial evidence to find a reasonable doubt." Rault, 445 So.2d at 1212. The instruction in the present case does not contain this type of defect.
The defendant also claims the definition of reasonable doubt given by the trial court in the present case was an overstatement of the degree of doubt required. However, the defendant cites no cases in support of this argument. However, the definition of reasonable doubt given by the trial court in Rault includes almost the exact language used in the present instruction. In Rault, the trial court instructed the jury: *670 A reasonable doubt is not a mere possible doubt. It is an actual or substantial doubt. It is a doubt that a reasonable man would seriously entertain. It is a serious doubt, for which you could give good reason. What is required is not an absolute or mathematical certainty, but a moral certainty.
Id. at 1211-1212. The instruction in Rault went on to define reasonable doubt in even more detail. The instruction was upheld. Thus, the definition given in the present case was not an overstatement of the degree of doubt required.
For the foregoing reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 16
The defendant urges that the ends of justice require the defendant's conviction be amended to manslaughter. He asks the court to see his argument in Assignment of Error Number 2. For the same reasons discussed in that assignment, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 17
The defendant says that his attorneys were constitutionally ineffective for the following reasons:
The defense should have rested after the State's case in chief concluded, relied upon the presumption of innocence, and argued to the jury the State's abject failure to prove Mr. Corley had committed any crime at all. The defense's decision to put on a case was in error, especially given the fact its hypothetical provocation theory (as to the victim's arguably having revealed her infidelity to Mr. Corley) had been hamstrung by the Court's granting the State's Motion in Limine. Had the defense rested after the State's case in chief, the verdict likely would have been different.
While defendant has proffered no evidence to support his speculation, we will, nevertheless, examine the legal requirements of proving ineffective counsel. A claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief. State v. Burkhalter, 428 So.2d 449 (La.1983). This enables the district judge to order a full evidentiary hearing on the matter. State v. Seiss, 428 So.2d 444 (La.1983). However, where the record contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue should be considered.
In order to prove that counsel was ineffective, the defendant must meet the twoprong test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
The defendant's claim of ineffectiveness is vague and ambiguous. The defendant does not point to any testimony introduced during the defense's case which prejudiced his case or would have contributed to a verdict of guilty. The witnesses offered by the defendant testified as to the victim's aggravation toward the defendant because of his drinking, particularly in the hours before the murder. The witnesses also testified as to the defendant's continuous attempts to give the victim CPR after she died and to his attentiveness to her body while at his grandmother's house.
Dr. Gerald Liuzza testified for the defense and offered testimony to shed doubt upon the theory that the victim was strangled to death. Dr. Liuzza testified that Dr. McCormick's report did not state the victim's hyoid bond had been fractured, which is something frequently seen in strangulations, although less commonly seen in younger people. Dr. Liuzza also testified that the report did not indicate bleeding in the muscles of the neck, which is often seen in strangulations. Finally, Dr. Liuzza testified that although not likely, CPR could possibly cause breaking of the air sacs in the lungs, as was found in the victim's case.
Defendant's counsel argued in his Opening Statement and Closing Argument that at most the defendant might be guilty of manslaughter in order to avoid a life sentence without parole for the defendant. He was not successful. Our review of the record *671 convinces us that defendant's counsel was highly professional in handling this trial. We find that defendant's counsel was not ineffective and apparently put on the best defense available to the defendant.
For these reasons, the defendant has not proved his trial counsel was ineffective. Further, even assuming that trial counsel erred in presenting a defense, the defendant has failed to show he was prejudiced; i.e., that the outcome of the trial would have been different. Thus, this assignment of error lacks merit.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.